# CHIARELLA *v.* UNITED STATES

No. 78–1202.  Argued November 5, 1979—Decided March·18, 1980

Powell, J., delivered the opinion of the Court, in which Stewart, White, Rehnquist, and Stevens, JJ., joined. Stevens, J., filed a concurring opinion, *post,* p. 237. Brennan, J., filed an opinion concurring in the judgment, *post,* p. 238. Burger, C. J., filed a dissenting opinion, *post,* p. 239. Blackmun, J., filed a dissenting opinion, in which Marshall, J., joined, *post,* p. 245.

*Stanley S. Arkin* argued the cause for petitioner. With him on the briefs were *Mark S. Arisohn* and *Arthur T. Cambouris.*

*Stephen M. Shapiro* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann, Deputy Solicitor General Geller, Sara Criscitelli, John S. Siffert, Ralph C. Ferrara,* and *Paul Gonson.**

---

*Arthur Fleischer, Jr., Harvey L. Pitt, Richard A. Steinwurtzel,* and *Richard O. Scribner* filed a memorandum for the Securities Industry Association as *amicus curiae.*

MR. JUSTICE POWELL delivered the opinion of the Court.

The question in this case is whether a person who learns from the confidential documents of one corporation that it is planning an attempt to secure control of a second corporation violates § 10 (b) of the Securities Exchange Act of 1934 if he fails to disclose the impending takeover before trading in the target company's securities.

## I

Petitioner is a printer by trade. In 1975 and 1976, he worked as a "markup man" in the New York composing room of Pandick Press, a financial printer. Among documents that petitioner handled were five announcements of corporate takeover bids. When these documents were delivered to the printer, the identities of the acquiring and target corporations were concealed by blank spaces or false names. The true names were sent to the printer on the night of the final printing.

The petitioner, however, was able to deduce the names of the target companies before the final printing from other information contained in the documents. Without disclosing his knowledge, petitioner purchased stock in the target companies and sold the shares immediately after the takeover attempts were made public.[1] By this method, petitioner realized a gain of slightly more than $30,000 in the course of 14 months. Subsequently, the Securities and Exchange Commission (Commission or SEC) began an investigation of his trading activities. In May 1977, petitioner entered into a consent decree with the Commission in which he agreed to return his profits to the sellers of the shares.[2] On the same day, he was discharged by Pandick Press.

---

[1] Of the five transactions, four involved tender offers and one concerned a merger. 588 F. 2d 1358, 1363, n. 2 (CA2 1978).

[2] *SEC v. Chiarella,* No. 77 Civ. Action No. 2534 (GLG) (SDNY May 24, 1977).

In January 1978, petitioner was indicted on 17 counts of violating § 10 (b) of the Securities Exchange Act of 1934 (1934 Act) and SEC Rule 10b–5.[3] After petitioner unsuccessfully moved to dismiss the indictment,[4] he was brought to trial and convicted on all counts.

The Court of Appeals for the Second Circuit affirmed petitioner's conviction. 588 F. 2d 1358 (1978). We granted certiorari, 441 U. S. 942 (1979), and we now reverse.

## II

Section 10 (b) of the 1934 Act, 48 Stat. 891, 15 U. S. C. § 78j, prohibits the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Pursuant to this section, the SEC promulgated Rule 10b–5 which provides in pertinent part: [5]

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

---

[3] Section 32 (a) of the 1934 Act sanctions criminal penalties against any person who willfully violates the Act. 15 U. S. C. § 78ff (a) (1976 ed., Supp. II). Petitioner was charged with 17 counts of violating the Act because he had received 17 letters confirming purchase of shares.

[4] 450 F. Supp. 95 (SDNY 1978).

[5] Only Rules 10b–5 (a) and (c) are at issue here. Rule 10b–5 (b) provides that it shall be unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5 (b) (1979). The portion of the indictment based on this provision was dismissed because the petitioner made no statements at all in connection with the purchase of stock.

"(a) To employ any device, scheme, or artifice to defraud, [or]

.        .        .        .        .

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b–5 (1979).

This case concerns the legal effect of the petitioner's silence. The District Court's charge permitted the jury to convict the petitioner if it found that he willfully failed to inform sellers of target company securities that he knew of a forthcoming takeover bid that would make their shares more valuable.[6] In order to decide whether silence in such circumstances violates § 10 (b), it is necessary to review the language and legislative history of that statute as well as its interpretation by the Commission and the federal courts.

Although the starting point of our inquiry is the language of the statute, *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 197 (1976), § 10 (b) does not state whether silence may constitute a manipulative or deceptive device. Section 10 (b) was designed as a catchall clause to prevent fraudulent practices. 425 U. S., at 202, 206. But neither the legislative history nor the statute itself affords specific guidance for the resolution of this case. When Rule 10b–5 was promulgated in 1942, the SEC did not discuss the possibility that failure to provide information might run afoul of § 10 (b).[7]

The SEC took an important step in the development of § 10 (b) when it held that a broker-dealer and his firm violated that section by selling securities on the basis of undisclosed information obtained from a director of the issuer corporation who was also a registered representative of the brokerage firm. In *Cady, Roberts & Co.,* 40 S. E. C. 907

---

[6] Record 682–683, 686.

[7] See SEC Securities Exchange Act Release No. 3230 (May 21, 1942), 7 Fed. Reg. 3804 (1942).

(1961), the Commission decided that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him. The obligation to disclose or abstain derives from

> "[a]n affirmative duty to disclose material information[, which] has been traditionally imposed on corporate 'insiders,' particularly officers, directors, or controlling stockholders. We, and the courts have consistently held that insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *Id.,* at 911.

The Commission emphasized that the duty arose from (i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure. *Id.,* at 912, and n. 15.[8]

That the relationship between a corporate insider and the stockholders of his corporation gives rise to a disclosure obligation is not a novel twist of the law. At common law, misrepresentation made for the purpose of inducing reliance

---

[8] In *Cady, Roberts,* the broker-dealer was liable under § 10 (b) because it received nonpublic information from a corporate insider of the issuer. Since the insider could not use the information, neither could the partners in the brokerage firm with which he was associated. The transaction in *Cady, Roberts* involved sale of stock to persons who previously may not have been shareholders in the corporation. 40 S. E. C., at 913, and n. 21. The Commission embraced the reasoning of Judge Learned Hand that "the director or officer assumed a fiduciary relation to the buyer by the very sale; for it would be a sorry distinction to allow him to use the advantage of his position to induce the buyer into the position of a beneficiary although he was forbidden to do so once the buyer had become one." *Id.,* at 914, n. 23, quoting *Gratz* v. *Claughton,* 187 F. 2d 46, 49 (CA2), cert. denied, 341 U. S. 920 (1951).

upon the false statement is fraudulent. But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." [9] In its *Cady, Roberts* decision, the Commission recognized a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.[10] This relationship gives rise to a duty to disclose because of the "necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of the

---

[9] Restatement (Second) of Torts § 551 (2) (a) (1976). See James & Gray, Misrepresentation—Part II, 37 Md. L. Rev. 488, 523–527 (1978). As regards securities transactions, the American Law Institute recognizes that "silence when there is a duty to . . . speak may be a fraudulent act." ALI, Federal Securities Code § 262 (b) (Prop. Off. Draft 1978).

[10] See 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 838 (rev. 1975); 3A *id.*, §§ 1168.2, 1171, 1174; 3 L. Loss, Securities Regulation 1446–1448 (2d ed. 1961); 6 *id.*, at 3557–3558 (1969 Supp.). See also *Brophy* v. *Cities Service Co.*, 31 Del. Ch. 241, 70 A. 2d 5 (1949). See generally Note, Rule 10b–5: Elements of a Private Right of Action, 43 N. Y. U. L. Rev. 541, 552–553, and n. 71 (1968); 75 Harv. L. Rev. 1449, 1450 (1962); Daum & Phillips, The Implications of Cady, Roberts, 17 Bus. L. 939, 945 (1962).

The dissent of MR. JUSTICE BLACKMUN suggests that the "special facts" doctrine may be applied to find that silence constitutes fraud where one party has superior information to another. *Post,* at 247–248. This Court has never so held. In *Strong* v. *Repide,* 213 U. S. 419, 431–434 (1909), this Court applied the special-facts doctrine to conclude that a corporate insider had a duty to disclose to a shareholder. In that case, the majority shareholder of a corporation secretly purchased the stock of another shareholder without revealing that the corporation, under the insider's direction, was about to sell corporate assets at a price that would greatly enhance the value of the stock. The decision in *Strong* v. *Repide* was premised upon the fiduciary duty between the corporate insider and the shareholder. See *Pepper* v. *Litton,* 308 U. S. 295, 307, n. 15 (1939).

uninformed minority stockholders." *Speed* v. *Transamerica Corp.*, 99 F. Supp. 808, 829 (Del. 1951).

The federal courts have found violations of § 10 (b) where corporate insiders used undisclosed information for their own benefit. *E. g., SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833 (CA2 1968), cert. denied, 404 U. S. 1005 (1971). The cases also have emphasized, in accordance with the common-law rule, that "[t]he party charged with failing to disclose market information must be under a duty to disclose it." *Frigitemp Corp.* v. *Financial Dynamics Fund, Inc.*, 524 F. 2d 275, 282 (CA2 1975). Accordingly, a purchaser of stock who has no duty to a prospective seller because he is neither an insider nor a fiduciary has been held to have no obligation to reveal material facts. See *General Time Corp.* v. *Talley Industries, Inc.*, 403 F. 2d 159, 164 (CA2 1968), cert. denied, 393 U. S. 1026 (1969).[11]

This Court followed the same approach in *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128 (1972). A group of American Indians formed a corporation to manage joint assets derived from tribal holdings. The corporation issued stock to its Indian shareholders and designated a local bank as its transfer agent. Because of the speculative nature of the corporate assets and the difficulty of ascertaining the true value of a share, the corporation requested the bank to stress to its stockholders the importance of retaining the stock. *Id.*, at 146. Two of the bank's assistant managers aided the shareholders in disposing of stock which the managers knew was traded in two separate markets—a primary market of

---

[11] See also *SEC* v. *Great American Industries, Inc.*, 407 F. 2d 453, 460 (CA2 1968), cert. denied, 395 U. S. 920 (1969); *Kohler* v. *Kohler Co.*, 319 F. 2d 634, 637–638 (CA7 1963); Note, 43 N. Y. U. L. Rev., *supra* n. 10, at 554; Note, The Regulation of Corporate Tender Offers Under Federal Securities Law: A New Challenge for Rule 10b–5, 33 U. Chi. L. Rev. 359, 373–374 (1966). See generally Note, Civil Liability under Rule X–10b–5, 42 Va. L. Rev. 537, 554–561 (1956).

Indians selling to non-Indians through the bank and a resale market consisting entirely of non-Indians. Indian sellers charged that the assistant managers had violated § 10 (b) and Rule 10b–5 by failing to inform them of the higher prices prevailing in the resale market. The Court recognized that no duty of disclosure would exist if the bank merely had acted as a transfer agent. But the bank also had assumed a duty to act on behalf of the shareholders, and the Indian sellers had relied upon its personnel when they sold their stock. 406 U. S., at 152. Because these officers of the bank were charged with a responsibility to the shareholders, they could not act as market makers inducing the Indians to sell their stock without disclosing the existence of the more favorable non-Indian market. *Id.*, at 152–153.

Thus, administrative and judicial interpretations have established that silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10 (b) despite the absence of statutory language or legislative history specifically addressing the legality of nondisclosure. But such liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction. Application of a duty to disclose prior to trading guarantees that corporate insiders, who have an obligation to place the shareholder's welfare before their own, will not benefit personally through fraudulent use of material, nonpublic information.[12]

---

[12] "Tippees" of corporate insiders have been held liable under § 10 (b) because they have a duty not to profit from the use of inside information that they know is confidential and know or should know came from a corporate insider, *Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F. 2d 228, 237–238 (CA2 1974). The tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty. Subcommittees of American Bar Association Section of Corporation, Banking, and Business Law, Comment Letter on Material, Non-Public Information (Oct. 15, 1973), reprinted in BNA, Securities Regulation & Law Report No. 233, pp. D–1, D–2 (Jan. 2, 1974).

## III

In this case, the petitioner was convicted of violating § 10 (b) although he was not a corporate insider and he received no confidential information from the target company. Moreover, the "market information" upon which he relied did not concern the earning power or operations of the target company, but only the plans of the acquiring company.[13] Petitioner's use of that information was not a fraud under § 10 (b) unless he was subject to an affirmative duty to disclose it before trading. In this case, the jury instructions failed to specify any such duty. In effect, the trial court instructed the jury that petitioner owed a duty to everyone; to all sellers, indeed, to the market as a whole. The jury simply was told to decide whether petitioner used material, nonpublic information at a time when "he knew other people trading in the securities market did not have access to the same information." Record 677.

The Court of Appeals affirmed the conviction by holding that "[a]nyone—corporate insider or not—who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose." 588 F. 2d, at 1365 (emphasis in original). Although the court said that its test would include only persons who regularly receive material, nonpublic information, id., at 1366, its rationale for that limitation is unrelated to the existence of a duty to disclose.[14] The Court of

---

[13] See Fleischer, Mundheim, & Murphy, An Initial Inquiry into the Responsibility to Disclose Market Information, 121 U. Pa. L. Rev. 798, 799 (1973).

[14] The Court of Appeals said that its "regular access to market information" test would create a workable rule embracing "those who occupy . . . strategic places in the market mechanism." 588 F. 2d, at 1365. These considerations are insufficient to support a duty to disclose. A duty arises from the relationship between parties, see nn. 9 and 10, supra, and

Appeals, like the trial court, failed to identify a relationship between petitioner and the sellers that could give rise to a duty. Its decision thus rested solely upon its belief that the federal securities laws have "created a system providing equal access to information necessary for reasoned and intelligent investment decisions." *Id.*, at 1362. The use by anyone of material information not generally available is fraudulent, this theory suggests, because such information gives certain buyers or sellers an unfair advantage over less informed buyers and sellers.

This reasoning suffers from two defects. First, not every instance of financial unfairness constitutes fraudulent activity under § 10 (b). See *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 474–477 (1977). Second, the element required to make silence fraudulent—a duty to disclose—is absent in this case. No duty could arise from petitioner's relationship with the sellers of the target company's securities, for petitioner had no prior dealings with them. He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a com-

---

accompanying text, and not merely from one's ability to acquire information because of his position in the market.

The Court of Appeals also suggested that the acquiring corporation itself would not be a "market insider" because a tender offeror creates, rather than receives, information and takes a substantial economic risk that its offer will be unsuccessful. 588 F. 2d, at 1366–1367. Again, the Court of Appeals departed from the analysis appropriate to recognition of a duty. The Court of Appeals for the Second Circuit previously held, in a manner consistent with our analysis here, that a tender offeror does not violate § 10 (b) when it makes preannouncement purchases precisely because there is no relationship between the offeror and the seller:

"We know of no rule of law . . . that a purchaser of stock, who was not an 'insider' and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale." *General Time Corp.* v. *Talley Industries, Inc.,* 403 F. 2d 159, 164 (1968), cert. denied, 393 U. S. 1026 (1969).

plete stranger who dealt with the sellers only through impersonal market transactions.

We cannot affirm petitioner's conviction without recognizing a general duty between all participants in market transactions to forgo actions based on material, nonpublic information. Formulation of such a broad duty, which departs radically from the established doctrine that duty arises from a specific relationship between two parties, see n. 9, *supra,* should not be undertaken absent some explicit evidence of congressional intent.

As we have seen, no such evidence emerges from the language or legislative history of § 10 (b). Moreover, neither the Congress nor the Commission ever has adopted a parity-of-information rule. Instead the problems caused by misuse of market information have been addressed by detailed and sophisticated regulation that recognizes when use of market information may not harm operation of the securities markets. For example, the Williams Act [15] limits but does not completely prohibit a tender offeror's purchases of target corporation stock before public announcement of the offer. Congress' careful action in this and other areas [16] contrasts, and

---

[15] Title 15 U. S. C. § 78m (d)(1) (1976 ed., Supp. II) permits a tender offeror to purchase 5% of the target company's stock prior to disclosure of its plan for acquisition.

[16] Section 11 of the 1934 Act generally forbids a member of a national securities exchange from effecting any transaction on the exchange for its own account. 15 U. S. C. § 78k (a)(1). But Congress has specifically exempted specialists from this prohibition—broker-dealers who execute orders for customers trading in a specific corporation's stock, while at the same time buying and selling that corporation's stock on their own behalf. § 11 (a)(1)(A), 15 U. S. C. § 78k (a)(1)(A); see S. Rep. No. 94–75, p. 99 (1975); Securities and Exchange Commission, Report of Special Study of Securities Markets, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 2, pp. 57–58, 76 (1963). See generally S. Robbins, The Securities Markets 191–193 (1966). The exception is based upon Congress' recognition that specialists contribute to a fair and orderly marketplace at the same time they exploit the informational advantage that comes from their pos-

is in some tension, with the broad rule of liability we are asked to adopt in this case.

Indeed, the theory upon which the petitioner was convicted is at odds with the Commission's view of § 10 (b) as applied to activity that has the same effect on sellers as the petitioner's purchases. "Warehousing" takes place when a corporation gives advance notice of its intention to launch a tender offer to institutional investors who then are able to purchase stock in the target company before the tender offer is made public and the price of shares rises.[17] In this case, as in warehousing, a buyer of securities purchases stock in a target corporation on the basis of market information which is unknown to the seller. In both of these situations, the seller's behavior presumably would be altered if he had the nonpublic information. Significantly, however, the Commission has acted to bar warehousing under its authority to regulate tender offers [18] after recognizing that action under § 10 (b) would rest on a "somewhat different theory" than that previously used to regulate insider trading as fraudulent activity.[19]

We see no basis for applying such a new and different theory of liability in this case. As we have emphasized before, the 1934 Act cannot be read " 'more broadly than its language and the statutory scheme reasonably permit.' " *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 578 (1979), quoting *SEC* v. *Sloan,* 436 U. S. 103, 116 (1978). Section 10 (b) is aptly

---

session of buy and sell orders. H. R. Doc. No. 95, *supra,* at 78–80. Similar concerns with the functioning of the market prompted Congress to exempt market makers, block positioners, registered odd-lot dealers, bona fide arbitrageurs, and risk arbitrageurs from § 11's general prohibition on member trading. 15 U. S. C. §§ 78k (a)(1)(A)–(D); see S. Rep. No. 94–75, *supra,* at 99. See also Securities Exchange Act Release No. 34–9950, 38 Fed. Reg. 3902, 3918 (1973).

[17] Fleischer, Mundheim, & Murphy, *supra* n. 13, at 811–812.

[18] SEC Proposed Rule § 240.14e–3, 44 Fed. Reg. 70352–70355, 70359 (1979).

[19] 1 SEC Institutional Investor Study Report, H. R. Doc. No. 92–64, pt. 1, p. xxxii (1971).

described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. We hold that a duty to disclose under § 10 (b) does not arise from the mere possession of nonpublic market information. The contrary result is without support in the legislative history of § 10 (b) and would be inconsistent with the careful plan that Congress has enacted for regulation of the securities markets. Cf. Santa Fe Industries, Inc. v. Green, 430 U. S., at 479.[20]

## IV

In its brief to this Court, the United States offers an alternative theory to support petitioner's conviction. It argues that petitioner breached a duty to the acquiring corporation when he acted upon information that he obtained by virtue of his position as an employee of a printer employed by the corporation. The breach of this duty is said to support a

---

[20] MR. JUSTICE BLACKMUN's dissent would establish the following standard for imposing criminal and civil liability under § 10 (b) and Rule 10b–5:

"[P]ersons having access to confidential material information that is not legally available to others generally are prohibited . . . from engaging in schemes to exploit their structural informational advantage through trading in affected securities." Post, at 251.

This view is not substantially different from the Court of Appeals' theory that anyone "who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose," 588 F. 2d, at 1365, and must be rejected for the reasons stated in Part III. Additionally, a judicial holding that certain undefined activities "generally are prohibited" by § 10 (b) would raise questions whether either criminal or civil defendants would be given fair notice that they have engaged in illegal activity. Cf. Grayned v. City of Rockford, 408 U. S. 104, 108–109 (1972).

It is worth noting that this is apparently the first case in which criminal liability has been imposed upon a purchaser for § 10 (b) nondisclosure. Petitioner was sentenced to a year in prison, suspended except for one month, and a 5-year term of probation. 588 F. 2d, at 1373, 1378 (Meskill, J., dissenting).

conviction under § 10 (b) for fraud perpetrated ·upon both the acquiring corporation and the sellers.

We need not decide whether this theory has merit for it was not submitted to the jury. The jury was told, in the language of Rule 10b–5, that it could convict the petitioner if it concluded that he either (i) employed a device, scheme, or artifice to defraud or (ii) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person. Record 681. The trial judge stated that a "scheme to defraud" is a plan to obtain money by trick or deceit and that "a failure by Chiarella to disclose material, non-public information in connection with his purchase of stock would constitute deceit." *Id.*, at 683. Accordingly, the jury was instructed that the petitioner employed a scheme to defraud if he "did not disclose . . . material non-public information in connection with the purchases of the stock." *Id.*, at 685–686.

Alternatively, the jury was instructed that it could convict if "Chiarella's alleged conduct of having purchased securities without disclosing material, non-public information would have or did have the effect of operating as a fraud upon a seller." *Id.*, at 686. The judge earlier had stated that fraud "embraces all the means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false misrepresentation, suggestions or by suppression of the truth." *Id.*, at 683.

The jury instructions demonstrate that petitioner was convicted merely because of his failure to disclose material, non-public information to sellers from whom he bought the stock of target corporations. The jury was not instructed on the nature or elements of a duty owed by petitioner to anyone other than the sellers. Because we cannot affirm a criminal conviction on the basis of a theory not presented to the jury, *Rewis* v. *United States*, 401 U. S. 808, 814 (1971), see *Dunn* v. *United States*, 442 U. S. 100, 106 (1979), we will not speculate upon whether such a duty exists, whether it has been

breached, or whether such a breach constitutes a violation of § 10 (b).[21]

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEVENS, concurring.

Before liability, civil or criminal, may be imposed for a Rule 10b–5 violation, it is necessary to identify the duty that the defendant has breached. Arguably, when petitioner bought securities in the open market, he violated (a) a duty to disclose owed to the sellers from whom he purchased target company stock and (b) a duty of silence owed to the acquiring companies. I agree with the Court's determination that petitioner owed no duty of disclosure to the sellers, that his conviction rested on the erroneous premise that he did owe them such a duty, and that the judgment of the Court of Appeals must therefore be reversed.

---

[21] The dissent of THE CHIEF JUSTICE relies upon a single phrase from the jury instructions, which states that the petitioner held a "confidential position" at Pandick Press, to argue that the jury was properly instructed on the theory "that a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading." *Post,* at 240. The few words upon which this thesis is based do not explain to the jury the nature and scope of the petitioner's duty to his employer, the nature and scope of petitioner's duty, if any, to the acquiring corporation, or the elements of the tort of misappropriation. Nor do the jury instructions suggest that a "confidential position" is a necessary element of the offense for which petitioner was charged. Thus, we do not believe that a "misappropriation" theory was included in the jury instructions.

The conviction would have to be reversed even if the jury had been instructed that it could convict the petitioner either (1) because of his failure to disclose material, nonpublic information to sellers or (2) because of a breach of a duty to the acquiring corporation. We may not uphold a criminal conviction if it is impossible to ascertain whether the defendant has been punished for noncriminal conduct. *United States* v. *Gallagher,* 576 F. 2d 1028, 1046 (CA3 1978); see *Leary* v. *United States,* 395 U. S. 6, 31–32 (1969); *Stromberg* v. *California,* 283 U. S. 359, 369–370 (1931).

The Court correctly does not address the second question: whether the petitioner's breach of his duty of silence—a duty he unquestionably owed to his employer and to his employer's customers—could give rise to criminal liability under Rule 10b-5. Respectable arguments could be made in support of either position. On the one hand, if we assume that petitioner breached a duty to the acquiring companies that had entrusted confidential information to his employers, a legitimate argument could be made that his actions constituted "a fraud or a deceit" upon those companies "in connection with the purchase or sale of any security."* On the other hand, inasmuch as those companies would not be able to recover damages from petitioner for violating Rule 10b-5 because they were neither purchasers nor sellers of target company securities, see *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, it could also be argued that no actionable violation of Rule 10b-5 had occurred. I think the Court wisely leaves the resolution of this issue for another day.

I write simply to emphasize the fact that we have not necessarily placed any stamp of approval on what this petitioner did, nor have we held that similar actions must be considered lawful in the future. Rather, we have merely held that petitioner's criminal conviction cannot rest on the theory that he breached a duty he did not owe.

I join the Court's opinion.

MR. JUSTICE BRENNAN, concurring in the judgment.

The Court holds, correctly in my view, that "a duty to disclose under § 10 (b) does not arise from the mere posses-

---

*See *Eason* v. *General Motors Acceptance Corp.*, 490 F. 2d 654 (CA7 1973), cert. denied, 416 U. S. 960. The specific holding in *Eason* was rejected in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723. However, the limitation on the right to recover pecuniary damages in a private action identified in *Blue Chip* is not necessarily coextensive with the limits of the rule itself. Cf. *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 42, n. 28, 43, n. 30, 47, n. 33.

sion of nonpublic market information." *Ante,* at 235. Prior to so holding, however, it suggests that no violation of § 10 (b) could be made out absent a breach of some duty arising out of a fiduciary relationship between buyer and seller. I cannot subscribe to that suggestion. On the contrary, it seems to me that Part I of THE CHIEF JUSTICE's dissent, *post,* at 239–243, correctly states the applicable substantive law—a person violates § 10 (b) whenever he improperly obtains or converts to his own benefit nonpublic information which he then uses in connection with the purchase or sale of securities.

While I agree with Part I of THE CHIEF JUSTICE's dissent, I am unable to agree with Part II. Rather, I concur in the judgment of the majority because I think it clear that the legal theory sketched by THE CHIEF JUSTICE is not the one presented to the jury. As I read them, the instructions in effect permitted the jurors to return a verdict of guilty merely upon a finding of failure to disclose material, nonpublic information in connection with the purchase of stock. I can find no instruction suggesting that one element of the offense was the improper conversion or misappropriation of that nonpublic information. Ambiguous suggestions in the indictment and the prosecutor's opening and closing remarks are no substitute for the proper instructions. And neither reference to the harmless-error doctrine nor some *post hoc* theory of constructive stipulation can cure the defect. The simple fact is that to affirm the conviction without an adequate instruction would be tantamount to directing a verdict of guilty, and that we plainly may not do.

MR. CHIEF JUSTICE BURGER, dissenting.

I believe that the jury instructions in this case properly charged a violation of § 10 (b) and Rule 10b–5, and I would affirm the conviction.

## I

As a general rule, neither party to an arm's-length business transaction has an obligation to disclose information to the

other unless the parties stand in some confidential or fiduciary relation. See W. Prosser, Law of Torts § 106 (2d ed. 1955). This rule permits a businessman to capitalize on his experience and skill in securing and evaluating relevant information; it provides incentive for hard work, careful analysis, and astute forecasting. But the policies that underlie the rule also should limit its scope. In particular, the rule should give way when an informational advantage is obtained, not by superior experience, foresight, or industry, but by some unlawful means. One commentator has written:

> "[T]he way in which the buyer acquires the information which he conceals from the vendor should be a material circumstance. The information might have been acquired as the result of his bringing to bear a superior knowledge, intelligence, skill or technical judgment; it might have been acquired by mere chance; or it might have been acquired by means of some tortious action on his part. . . . *Any time information is acquired by an illegal act it would seem that there should be a duty to disclose that information.*" Keeton, Fraud—Concealment and Non-Disclosure, 15 Texas L. Rev. 1, 25–26 (1936) (emphasis added).

I would read § 10 (b) and Rule 10b–5 to encompass and build on this principle: to mean that a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading.

The language of § 10 (b) and of Rule 10b–5 plainly supports such a reading. By their terms, these provisions reach *any* person engaged in *any* fraudulent scheme. This broad language negates the suggestion that congressional concern was limited to trading by "corporate insiders" or to deceptive practices related to "corporate information." [1] Just as surely

---

[1] Academic writing in recent years has distinguished between "corporate information"—information which comes from within the corporation

Congress cannot have intended one standard of fair dealing for "white collar" insiders and another for the "blue collar" level. The very language of § 10 (b) and Rule 10b–5 "by repeated use of the word 'any' [was] obviously meant to be inclusive." *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972).

The history of the statute and of the Rule also supports this reading. The antifraud provisions were designed in large measure "to assure that dealing in securities is fair and without undue preferences or advantages among investors." H. R. Conf. Rep. No. 94–229, p. 91 (1975). These provisions prohibit "those manipulative and deceptive practices which have been demonstrated to fulfill no useful function." S. Rep. No. 792, 73d Cong., 2d Sess., 6 (1934). An investor who purchases securities on the basis of misappropriated nonpublic information possesses just such an "undue" trading advantage; his conduct quite clearly serves no useful function except his own enrichment at the expense of others.

This interpretation of § 10 (b) and Rule 10b–5 is in no sense novel. It follows naturally from legal principles enunciated by the Securities and Exchange Commission in its seminal *Cady, Roberts* decision. 40 S. E. C. 907 (1961). There, the Commission relied upon two factors to impose a duty to disclose on corporate insiders: (1) ". . . access . . . to information intended to be available only for a corporate purpose *and not for the personal benefit of anyone*" (emphasis added); and (2) the unfairness inherent in trading on such information when it is inaccessible to those with whom one is dealing. Both of these factors are present whenever a party gains an

---

and reflects on expected earnings or assets—and "market information." See, *e. g.,* Fleischer, Mundheim, & Murphy, An Initial Inquiry into the Responsibility to Disclose Market Information, 121 U. Pa. L. Rev. 798, 799 (1973). It is clear that § 10 (b) and Rule 10b–5 by their terms and by their history make no such distinction. See Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, 93 Harv. L. Rev. 322, 329–333 (1979).

242

informational advantage by unlawful means.[2]   Indeed, in *In re Blyth & Co.*, 43 S. E. C. 1037 (1969), the Commission applied its *Cady, Roberts* decision in just such a context.   In that case a broker-dealer had traded in Government securities on the basis of confidential Treasury Department information which it received from a Federal Reserve Bank employee.   The Commission ruled that the trading was "improper use of inside information" in violation of § 10 (b) and Rule 10b–5.   43 S. E. C., at 1040.   It did not hesitate to extend *Cady, Roberts* to reach a "tippee" of a Government insider.[3]

Finally, it bears emphasis that this reading of § 10b and Rule 10b–5 would not threaten legitimate business practices. So read, the antifraud provisions would not impose a duty on a tender offeror to disclose its acquisition plans during the period in which it "tests the water" prior to purchasing a full 5% of the target company's stock.   Nor would it proscribe "warehousing."   See generally SEC, Institutional Investor Study Report, H. R. Doc. No. 92–64, pt. 4, p. 2273 (1971). Likewise, market specialists would not be subject to a disclose-or-refrain requirement in the performance of their every-

---

[2] See Financial Analysts Rec., Oct. 7, 1968, pp. 3, 5 (interview with SEC General Counsel Philip A. Loomis, Jr.) (the essential characteristic of insider information is that it is "received in confidence for a purpose other than to use it for the person's own advantage and to the disadvantage of the investing public in the market").   See also Note, The Government Insider and Rule 10b–5: A New Application for an Expanding Doctrine, 47 S. Cal. L. Rev. 1491, 1498–1502 (1974).

[3] This interpretation of the antifraud provisions also finds support in the recently proposed Federal Securities Code prepared by the American Law Institute under the direction of Professor Louis Loss.   The ALI Code would construe the antifraud provisions to cover a class of "quasi-insiders," including a judge's law clerk who trades on information in an unpublished opinion or a Government employee who trades on a secret report.   See ALI Federal Securities Code § 1603, comment 3 (d), pp. 538–539 (Prop. Off. Draft 1978).   These quasi-insiders share the characteristic that their informational advantage is obtained by conversion and not by legitimate economic activity that society seeks to encourage.

day market functions. In each of these instances, trading is accomplished on the basis of material, nonpublic information, but the information has not been unlawfully converted for personal gain.

## II.

The Court's opinion, as I read it, leaves open the question whether § 10 (b) and Rule 10b–5 prohibit trading on misappropriated nonpublic information.[4] Instead, the Court apparently concludes that this theory of the case was not submitted to the jury. In the Court's view, the instructions given the jury were premised on the erroneous notion that the mere failure to disclose nonpublic information, however acquired, is a deceptive practice. And because of this premise, the jury was not instructed that the means by which Chiarella acquired his informational advantage—by violating a duty owed to the acquiring companies—was an element of the offense. See *ante*, at 236.

The Court's reading of the District Court's charge is unduly restrictive. Fairly read as a whole and in the context of the trial, the instructions required the jury to find that Chiarella obtained his trading advantage by misappropriating the property of his employer's customers. The jury was charged that "[i]n simple terms, the charge is that Chiarella wrongfully took advantage of information he acquired *in the course of his confidential position at Pandick Press* and secretly used that information when he knew other people trading in the securities market did not have access to the same information

---

[4] There is some language in the Court's opinion to suggest that only "a relationship between petitioner and the sellers . . . could give rise to a duty [to disclose]." *Ante*, at 232. The Court's holding, however, is much more limited, namely, that mere possession of material, nonpublic information is insufficient to create a duty to disclose or to refrain from trading. *Ante*, at 235. Accordingly, it is my understanding that the Court has not rejected the view, advanced above, that an absolute duty to disclose or refrain arises from the very act of misappropriating nonpublic information.

that he had at a time when he knew that that information was material to the value of the stock." Record 677 (emphasis added). The language parallels that in the indictment, and the jury had that indictment during its deliberations; it charged that Chiarella had traded "without disclosing the material non-public information he had obtained in connection with his employment." It is underscored by the clarity which the prosecutor exhibited in his opening statement to the jury. No juror could possibly have failed to understand what the case was about after the prosecutor said: "In sum what the indictment charges is that Chiarella misused material non-public information for personal gain and that he took unfair advantage of his position of trust with the full knowledge that it was wrong to do so. That is what the case is about. It is that simple." *Id.*, at 46. Moreover, experienced defense counsel took no exception and uttered no complaint that the instructions were inadequate in this regard.

In any event, even assuming the instructions were deficient in not charging misappropriation with sufficient precision, on this record any error was harmless beyond a reasonable doubt. Here, Chiarella, himself, testified that he obtained his informational advantage by decoding confidential material entrusted to his employer by its customers. *Id.*, at 474–475. He admitted that the information he traded on was "confidential," not "to be use[d] . . . for personal gain." *Id.*, at 496. In light of this testimony, it is simply inconceivable to me that any shortcoming in the instructions could have "possibly influenced the jury adversely to [the defendant]." *Chapman* v. *California*, 386 U. S. 18, 23 (1967). See also *United States* v. *Park*, 421 U. S. 658, 673–676 (1975). Even more telling perhaps is Chiarella's counsel's statement in closing argument:

> "Let me say right up front, too, Mr. Chiarella got on the stand and he conceded, he said candidly, 'I used clues I got while I was at work. I looked at these various doc-

uments and I deciphered them and I decoded them and I used that information as a basis for purchasing stock.' There is no question about that. We don't have to go through a hullabaloo about that. It is something he concedes. There is no mystery about that." Record 621.

In this Court, counsel similarly conceded that "[w]e do not dispute the proposition that Chiarella *violated his duty as an agent of the offeror corporations not to use their confidential information for personal profit.*" Reply Brief for Petitioner 4 (emphasis added). See Restatement (Second) of Agency § 395 (1958). These statements are tantamount to a formal stipulation that Chiarella's informational advantage was unlawfully obtained. And it is established law that a stipulation related to an essential element of a crime must be regarded by the jury as a fact conclusively proved. See 8 J. Wigmore, Evidence § 2590 (McNaughton rev. 1961); *United States v. Houston,* 547 F. 2d 104 (CA9 1976).

In sum, the evidence shows beyond all doubt that Chiarella, working literally in the shadows of the warning signs in the printshop, misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence. He then exploited his ill-gotten informational advantage by purchasing securities in the market. In my view, such conduct plainly violates § 10 (b) and Rule 10b–5. Accordingly, I would affirm the judgment of the Court of Appeals.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE MARSHALL joins, dissenting.

Although I agree with much of what is said in Part I of the dissenting opinion of THE CHIEF JUSTICE, *ante,* p. 239, I write separately because, in my view, it is unnecessary to rest petitioner's conviction on a "misappropriation" theory. The fact that petitioner Chiarella purloined, or, to use THE CHIEF

JUSTICE's word, *ante,* at 245, "stole," information concerning
pending tender offers certainly is the most dramatic evidence
that petitioner was guilty of fraud. He has conceded that he
knew it was wrong, and he and his co-workers in the print-
shop were specifically warned by their employer that actions
of this kind were improper and forbidden. But I also would
find petitioner's conduct fraudulent within the meaning of
§ 10 (b) of the Securities Exchange Act of 1934, 15 U. S. C.
§ 78j (b), and the Securities and Exchange Commission's Rule
10b–5, 17 CFR § 240.10b–5 (1979), even if he had obtained
the blessing of his employer's principals before embarking on
his profiteering scheme. Indeed, I think petitioner's brand
of manipulative trading, with or without such approval, lies
close to the heart of what the securities laws are intended to
prohibit.

The Court continues to pursue a course, charted in certain
recent decisions, designed to transform § 10 (b) from an inten-
tionally elastic "catchall" provision to one that catches rela-
tively little of the misbehavior that all too often makes
investment in securities a needlessly risky business for the
uninitiated investor. See, *e. g., Ernst & Ernst* v. *Hochfelder,*
425 U. S. 185 (1976); *Blue Chip Stamps* v. *Manor Drug
Stores,* 421 U. S. 723 (1975). Such confinement in this case
is now achieved by imposition of a requirement of a "special
relationship" akin to fiduciary duty before the statute gives
rise to a duty to disclose or to abstain from trading upon
material, nonpublic information.[1] The Court admits that this
conclusion finds no mandate in the language of the statute or
its legislative history. *Ante,* at 226. Yet the Court fails even
to attempt a justification of its ruling in terms of the purposes

---

[1] The Court fails to specify whether the obligations of a special relation-
ship must fall directly upon the person engaging in an allegedly fraudulent
transaction, or whether the derivative obligations of "tippees," that lower
courts long have recognized, are encompassed by its rule. See *ante,* at 230,
n. 12; cf. *Foremost-McKesson, Inc.* v. *Provident Securities Co.,* 423 U. S.
232, 255, n. 29 (1976).

of the securities laws, or to square that ruling with the long-standing but now much abused principle that the federal securities laws are to be construed flexibly rather than with narrow technicality. See *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972); *Superintendent of Insurance* v. *Bankers Life & Casualty Co.,* 404 U. S. 6, 12 (1971); *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180, 186 (1963).

I, of course, agree with the Court that a relationship of trust can establish a duty to disclose under § 10 (b) and Rule 10b–5. But I do not agree that a failure to disclose violates the Rule only when the responsibilities of a relationship of that kind have been breached. As applied to this case, the Court's approach unduly minimizes the importance of petitioner's *access* to confidential information that the honest investor, no matter how diligently he tried, could not legally obtain. In doing so, it further advances an interpretation of § 10 (b) and Rule 10b–5 that stops short of their full implications. Although the Court draws support for its position from certain precedent, I find its decision neither fully consistent with developments in the common law of fraud, nor fully in step with administrative and judicial application of Rule 10b–5 to "insider" trading.

The common law of actionable misrepresentation long has treated the possession of "special facts" as a key ingredient in the duty to disclose. See *Strong* v. *Repide,* 213 U. S. 419, 431–433 (1909); 1 F. Harper & F. James, Law of Torts § 7.14 (1956). Traditionally, this factor has been prominent in cases involving confidential or fiduciary relations, where one party's inferiority of knowledge and dependence upon fair treatment is a matter of legal definition, as well as in cases where one party is on notice that the other is "acting under a mistaken belief with respect to a material fact." *Frigitemp Corp.* v. *Financial Dynamics Fund, Inc.,* 524 F. 2d 275, 283 (CA2 1975); see also Restatement of Torts § 551 (1938). Even at common law, however, there has been a trend away from strict adherence to the harsh maxim *caveat emptor* and

toward a more flexible, less formalistic understanding of the duty to disclose. See, *e. g.,* Keeton, Fraud—Concealment and Non-Disclosure, 15 Texas L. Rev. 1, 31 (1936). Steps have been taken toward application of the "special facts" doctrine in a broader array of contexts where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. See James & Gray, Misrepresentation—Part II, 37 Md. L. Rev. 488, 526–527 (1978); 3 Restatement (Second) of Torts § 551 (e), Comment *l* (1977); *id.,* at 166–167 (Tent. Draft No. 10, 1964). See also *Lingsch* v. *Savage,* 213 Cal. App. 2d 729, 735–737, 29 Cal. Rptr. 201, 204–206 (1963); *Jenkins* v. *McCormick,* 184 Kan. 842, 844–845, 339 P. 2d 8, 11 (1959); *Jones* v. *Arnold,* 359 Mo. 161, 169–170, 221 S. W. 2d 187, 193–194 (1949); *Simmons* v. *Evans,* 185 Tenn. 282, 285–287, 206 S. W. 2d 295, 296–297 (1947).

By its narrow construction of § 10 (b) and Rule 10b–5, the Court places the federal securities laws in the rearguard of this movement, a position opposite to the expectations of Congress at the time the securities laws were enacted. Cf. H. R. Rep. No. 1383, 73d Cong., 2d Sess., 5 (1934). I cannot agree that the statute and Rule are so limited. The Court has observed that the securities laws were not intended to replicate the law of fiduciary relations. *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 474–476 (1977). Rather, their purpose is to ensure the fair and honest functioning of impersonal national securities markets where common-law protections have proved inadequate. Cf. *United States* v. *Naftalin,* 441 U. S. 768, 775 (1979). As Congress itself has recognized, it is integral to this purpose "to assure that dealing in securities is fair and without undue preferences or advantages among investors." H. R. Conf. Rep. No. 94–229, p. 91 (1975).

Indeed, the importance of access to "special facts" has been a recurrent theme in administrative and judicial application

of Rule 10b–5 to insider trading. Both the SEC and the courts have stressed the insider's misuse of secret knowledge as the gravamen of illegal conduct. The Court, I think, unduly minimizes this aspect of prior decisions.

*Cady, Roberts & Co.*, 40 S. E. C. 907 (1961), which the Court discusses at some length, provides an illustration. In that case, the Commission defined the category of "insiders" subject to a disclose-or-abstain obligation according to two factors:

"[F]irst, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing." *Id.*, at 912 (footnote omitted).

The Commission, thus, regarded the insider "relationship" primarily in terms of *access* to nonpublic information, and not merely in terms of the presence of a common-law fiduciary duty or the like. This approach was deemed to be in keeping with the principle that "the broad language of the anti-fraud provisions" should not be "circumscribed by fine distinctions and rigid classifications," such as those that prevailed under the common law. *Ibid.* The duty to abstain or disclose arose, not merely as an incident of fiduciary responsibility, but as a result of the "inherent unfairness" of turning secret information to account for personal profit. This understanding of Rule 10b–5 was reinforced when *Investors Management Co.*, 44 S. E. C. 633, 643 (1971), specifically rejected the contention that a "special relationship" between the alleged violator and an "insider" source was a necessary requirement for liability.

A similar approach has been followed by the courts. In *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 848 (CA2

250

1968) (en banc), cert. denied *sub nom. Coates* v. *SEC*, 394 U. S. 976 (1969), the court specifically mentioned the common-law "special facts" doctrine as one source for Rule 10b–5, and it reasoned that the Rule is "based in policy on the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information." See also *Lewelling* v. *First California Co.,* 564 F. 2d 1277, 1280 (CA9 1977); *Speed* v. *Transamerica Corp.,* 99 F. Supp. 808, 829 (Del. 1951). In addition, cases such as *Myzel* v. *Fields,* 386 F. 2d 718, 739 (CA8 1967), cert. denied, 390 U. S. 951 (1968), and *A. T. Brod & Co.* v. *Perlow,* 375 F. 2d 393, 397 (CA2 1967), have stressed that § 10 (b) and Rule 10b–5 apply to any kind of fraud by any person. The concept of the "insider" itself has been flexible; wherever confidential information has been abused, prophylaxis has followed. See, *e. g., Zweig* v. *Hearst Corp.,* 594 F. 2d 1261 (CA9 1979) (financial columnist); *Shapiro* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F. 2d 228 (CA2 1974) (institutional investor); *SEC* v. *Shapiro,* 494 F. 2d 1301 (CA2 1974) (merger negotiator); *Chasins* v. *Smith, Barney & Co.,* 438 F. 2d 1167 (CA2 1970) (market maker). See generally 2 A. Bromberg & L. Lowenfels, Securities Law & Commodities Fraud § 7.4 (6)(b) (1979).

I believe, and surely thought, that this broad understanding of the duty to disclose under Rule 10b–5 was recognized and approved in *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128 (1972). That case held that bank agents dealing in the stock of a Ute Indian development corporation had a duty to reveal to mixed-blood Indian customers that their shares could bring a higher price on a non-Indian market of which the sellers were unaware. *Id.,* at 150–153. The Court recognized that "by repeated use of the word 'any,'" the statute and Rule "are obviously meant to be inclusive." *Id.,* at 151. Although it found a relationship of trust between

the agents and the Indian sellers, the Court also clearly established that the bank and its agents were subject to the strictures of Rule 10b–5 because of their strategic position in the marketplace. The Indian sellers had no knowledge of the non-Indian market. The bank agents, in contrast, had intimate familiarity with the non-Indian market, which they had promoted actively, and from which they and their bank both profited. In these circumstances, the Court held that the bank and its agents "possessed the affirmative duty under the Rule" to disclose market information to the Indian sellers, and that the latter "had the right to know" that their shares would sell for a higher price in another market. *Id.*, at 153.

It seems to me that the Court, *ante,* at 229–230, gives *Affiliated Ute Citizens* an unduly narrow interpretation. As I now read my opinion there for the Court, it lends strong support to the principle that a structural disparity in access to material information is a critical factor under Rule 10b–5 in establishing a duty either to disclose the information or to abstain from trading. Given the factual posture of the case, it was unnecessary to resolve the question whether such a structural disparity could sustain a duty to disclose even absent "a relationship of trust and confidence between parties to a transaction." *Ante,* at 230. Nevertheless, I think the rationale of *Affiliated Ute Citizens* definitely points toward an affirmative answer to that question. Although I am not sure I fully accept the "market insider" category created by the Court of Appeals, I would hold that persons having access to confidential material information that is not legally available to others generally are prohibited by Rule 10b–5 from engaging in schemes to exploit their structural informational advantage through trading in affected securities. To hold otherwise, it seems to me, is to tolerate a wide range of manipulative and deceitful behavior. See *Blyth & Co.,* 43 S. E. C. 1037 (1969); *Herbert L. Honohan,* 13 S. E. C. 754 (1943); see generally Brudney, Insiders, Outsiders, and Informational Advantages

under the Federal Securities Laws, 93 Harv. L. Rev. 322 (1979).[2]

Whatever the outer limits of the Rule, petitioner Chiarella's case fits neatly near the center of its analytical framework. He occupied a relationship to the takeover companies giving him intimate access to concededly material information that was sedulously guarded from public access. The information, in the words of *Cady, Roberts & Co.,* 40 S. E. C., at 912, was "intended to be available only for a corporate purpose and not for the personal benefit of anyone." Petitioner, moreover, knew that the information was unavailable to those with whom he dealt. And he took full, virtually riskless advantage of this artificial information gap by selling the stocks shortly after each takeover bid was announced. By any reasonable definition, his trading was "inherent[ly] unfai[r]." *Ibid.* This misuse of confidential information was clearly placed before the jury. Petitioner's conviction, therefore, should be upheld, and I dissent from the Court's upsetting that conviction.

---

[2] The Court observes that several provisions of the federal securities laws limit but do not prohibit trading by certain investors who may possess nonpublic market information. *Ante,* at 233–234. It also asserts that "neither the Congress nor the Commission ever has adopted a parity-of-information rule." *Ante,* at 233. In my judgment, neither the observation nor the assertion undermines the interpretation of Rule 10b–5 that I support and that I have endeavored briefly to outline. The statutory provisions cited by the Court betoken a congressional purpose not to leave the exploitation of structural informational advantages unregulated. Letting Rule 10b–5 operate as a "catchall" to ensure that these narrow exceptions granted by Congress are not expanded by circumvention completes this statutory scheme. Furthermore, there is a significant conceptual distinction between parity of information and parity of *access* to material information. The latter gives free rein to certain kinds of informational advantages that the former might foreclose, such as those that result from differences in diligence or acumen. Indeed, by limiting opportunities for profit from manipulation of confidential connections or resort to stealth, equal access helps to ensure that advantages obtained by honest means reap their full reward.