**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff,

v.

**Roger D. BLACKWELL,**
et al., Defendants.

**No. 03–CV–63.**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 19, 2003.

Asheesh Goel, Gregory P. von Schaumburg, Peter B. Driscoll, U.S. Securities & Exchange Commission, Chicago, IL, Mark Thomas D'Alessandro, United States Attorney's Office, Columbus, OH, for Plaintiff.

Thomas O. Gorman, Daniel William Costello, Porter Wright Morris & Arthur, John Stephen Teetor, Maribeth Deavers, Isaac Brant Ledman & Teetor, Christopher Craig Woods, P. Brian See, Squire Sanders & Dempsey, Arnold L. Jack, pro se, Jack & Snyder, Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This enforcement action filed by the United States Securities and Exchange Commission (the "SEC" or the "Commission") involves alleged insider trading in the stock of Worthington Foods, Inc. ("Worthington"). The SEC alleges that Defendant Roger D. Blackwell ("Blackwell"), a director of Worthington, provided illegal tips to close friends and family members prior to the October 1, 1999, announcement that the Kellogg Company ("Kellogg") had entered into an agreement to acquire Worthington. The SEC contends that these tips allowed the other named Defendants to profit in violation of the federal securities laws. Jurisdiction is proper under Sections 21 and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u and 78aa.

This matter is currently before the Court on Motions to Dismiss filed by Defendants Roger Blackwell, both in his personal capacity and in his capacity as trustee of the Roger Blackwell & Associates Pension Plan Trust (the "Pension Plan Trust"); Dale Blackwell, Roger Blackwell's father; Christian Blackwell, Roger Blackwell's son; Arnold L. Jack, Roger Blackwell's close friend and business associate; and Black–Jack Enterprises ("Black–Jack"), Roger Blackwell and Arnold Jack's business partnership. This matter is also before the Court on a Motion for Judgment on the Pleadings filed by Defendants Kelley L. Hughes, Roger Blackwell's office manager at Blackwell & Associates, and her husband Kevin L. Stacy. All Defendants have adopted at least some portion of Roger Blackwell's Motion to Dismiss as their own. For the following reasons, the Court **DENIES** the Motions to Dismiss of all moving Defendants and **DENIES** Defendants Hughes and Stacy's Motion for Judgment on the Pleadings.

### II. BACKGROUND

#### A. Facts

The following facts are taken from the SEC's Complaint.

Defendant Roger Blackwell is a nationally recognized expert in consumer behavior and marketing. He is a high-profile marketing professor at The Ohio State University and is a member of the boards of directors of several public and private companies. From 1992 to November 29, 1999, Blackwell was a member of the board of directors of Worthington (the "Board"), which, at the time, was a publicly traded corporation based in Worthington, Ohio, that produced meat alternative food products made from soy and wheat proteins. Worthington's securities were registered under Section 12(g) of the Exchange Act. Its common stock was traded on the Nasdaq National Market, and its options were traded on the Philadelphia Stock Exchange.[1] Blackwell was also, at all relevant times, the president and sole owner of Blackwell & Associates, a consulting firm; the trustee of the Pension Plan Trust; and a general partner and 50% owner, along with Defendant Jack, of Defendant Black–Jack, an investment partnership.

On July 8, 1999, representatives from Kellogg approached Worthington's Chairman, President, and Chief Executive Officer, Dale Twomley, to discuss the possibility of a business combination. On July 16, 1999, top Kellogg officials met with Twomley and other Worthington officials to execute a confidentiality agreement. On July 20, 1999, during a regularly scheduled Board meeting, Twomley informed the Board of the ongoing discussions with Kellogg. At that meeting, the Board authorized management to engage an investment banker. Blackwell attended this and all other Board meetings in July, August, and September 1999, appearing either in person or by telephone.

On August 10, 1999, Twomley and Worthington officials discussed pricing the deal at .76 Kellogg share per Worthington share ($26.08 per Worthington share). In August and September 1999, Worthington's stock was trading in the $11 15/16 to $14 3/8 range. On August 11, 1999, during a special telephonic meeting, the Board authorized the negotiation of a definitive merger agreement. Soon thereafter, Worthington formally engaged an investment banker and began its due diligence process.

On August 26, 1999, during a special telephonic meeting, the Board authorized management to pursue an all cash transaction. On August 30, 1999, Kellogg delivered to Worthington an initial draft of the merger agreement. On September 8, 1999, the Board met with legal counsel to review the merger agreement. On September 23, 1999, Twomley and Kellogg officials agreed to a price of $24 per share for Worthington stock. The next day, on September 24, 1999, the Board held a special meeting during which the directors authorized management to complete the definitive agreement. Copies of the merger agreement were sent to the Worthington directors on September 27, 1999. On September 29, 1999, the Board met and approved the merger agreement. The parties executed the merger agreement by the end of the day on September 30, 1999. On the morning of October 1, 1999, the parties issued a press release announcing

---

1. At all relevant times, Worthington had a policy that prohibited employees and directors from trading in Worthington securities while in possession of material, non-public information. Worthington's policy also prohibited employees and directors from using material non-public information for personal benefit. In addition, Worthington required all executives and directors to seek approval prior to engaging in transactions in Worthington securities. As a member of the Board, Blackwell was aware of, and was bound by, these policies.

the merger agreement in which Kellogg would pay $24 for each share of Worthington stock. On that day, Worthington's stock price closed at $23 1/16, up $8.75, or 61.4%, from the previous day's closing.

The SEC alleges that Blackwell illegally provided material non-public information regarding Worthington's merger with Kellogg to family members and friends who profited by illegally trading on this information. On September 8, 1999, after the special Board meeting held on that day to discuss the proposed merger, Blackwell visited the home of his father, Defendant Dale Blackwell. During that visit, Dale Blackwell asked his son whether he should invest in Worthington and Bank One. At that time, Defendants Roger and Dale Blackwell discussed both Worthington and Bank One. During the course of the conversation, Blackwell allegedly disclosed material non-public information concerning Kellogg's acquisition of Worthington to his father. As a result of that conversation, Dale Blackwell purchased 1,000 shares of Worthington stock on September 13, 1999, and 1,000 shares of Worthington stock on September 20, 1999. After spending a total of $25,023.08 on the Worthington stock, Dale Blackwell sold it, on October 6, 1999, for $45,894.59. As a result of the September 8, 1999, conversation, Dale Blackwell also bought 100 shares of Bank One stock, spending $3,900.

In late August 1999, Defendant Christian Blackwell, Blackwell's adult son, had a telephone conversation with his father in which they discussed investing in Worthington and several other companies on whose boards Blackwell served as a director. Blackwell had a long-standing practice of giving investment advice and financial assistance to his son. In the August 1999 telephone conversation, Blackwell allegedly disclosed material non-public information to Christian Blackwell concerning Kellogg's acquisition of Worthington. As a result of that conversation, Christian Blackwell purchased 388 shares of Worthington stock for three separate accounts, spending $4,994.99.[2] He had never before bought Worthington stock. On December 10, 1999, Christian Blackwell sold the Worthington stock, earning proceeds of $9,312.00.

Defendant Kelley Hughes has worked for Blackwell & Associates for ten years and is allegedly a close confidant of Blackwell. She typically makes investment decisions jointly with her husband, Defendant Kevin Stacy. In the six months prior to September 1999, Hughes and Stacy had not placed any trades in the stock market. While they had previously invested in Worthington stock, they had only made three small purchases of Worthington stock, the most recent in February 1999 for 250 shares. On August 31, 1999, Blackwell met with Hughes as part of Hughes's year-end performance review. During this and additional conversations in September 1999, Blackwell allegedly disclosed to Hughes material non-public information concerning Kellogg's proposed acquisition of Worthington. Shortly after the August 31, 1999, conversation and at various points in September, Hughes allegedly disclosed to Stacy material non-public information concerning Kellogg's proposed acquisition of Worthington.

**2.** Christian Blackwell purchased 38 shares for one account on August 30, 1999, and 150 shares for another account on August 30, 1999. The 200 shares in a third account were not filled until September 20, 1999, because that account was a new Roth IRA account and a custodial transfer of funds had to be completed before the purchase. One check Christian Blackwell wrote to his broker to help pay for the Worthington stock was returned for insufficient funds.

On September 1, 1999, Hughes and Stacy purchased 180 shares of Worthington stock. They purchased an additional 10,106 shares on September 20, 21, 22, 29, and 30, 1999. They spent a total of $129,655.33 on the Worthington stock. When they sold these shares, on October 4 and 5, 1999, their proceeds totaled $234,609.80. Hughes and Stacy's investment in Worthington stock was their largest investment ever in a single stock. The amount of the investment equaled 150% of their combined annual income. The investment utilized substantially all of Hughes and Stacy's liquid assets, including a $30,000 payment from either Roger Blackwell or Blackwell & Associates that was apparently some sort of interest-free loan.[3]

Defendant Roger Blackwell is sole trustee of the Pension Plan Trust, of which both his wife Kristina and Defendant Hughes are direct beneficiaries. Blackwell, his wife, and Defendant Hughes each had authority to make trades on behalf of the Pension Plan Trust. To the extent the pension plan funded by the trust might be overfunded, Blackwell & Associates owns the excess funds; to the extent it might be underfunded, Blackwell & Associates is responsible for providing the remainder. On September 27 and 29, 1999, Defendant Hughes caused the Pension Plan Trust to purchase 5,300 shares of Worthington

stock for a total cost of $61,028.95. These were the first trades Hughes had ever placed on behalf of the Pension Plan Trust. On October 4, 1999, the Pension Plan Trust sold the Worthington stock for a profit of $57,023.29. In the Complaint, the SEC states, "Upon information and belief, defendant Hughes made these trades on behalf of the Blackwell Pension Plan Trust with defendant Roger Blackwell's knowledge and/or consent, at his direction, or with his subsequent ratification." Blackwell did not disclose these purchases or sales to the SEC.

Blackwell and Defendant Jack have been business associates and friends for 30 years. Jack, a lawyer, has represented Blackwell in the past. The two men have jointly owned real estate and are partners in Defendant Black–Jack. On September 7, 1999, at 1:43 p.m., Defendant Jack made a seven-minute phone call to Blackwell's office at Blackwell & Associates. Blackwell allegedly disclosed material non-public information concerning Kellogg's proposed acquisition of Worthington to Jack during this call. Immediately following the call, at 1:50 p.m., Jack placed a five-minute call to his Advest broker in which he placed a buy order for 1,000 shares of Worthington stock. During the next two days, Defendant Jack purchased an additional 1,500 shares of Worthington stock. In late Sep-

---

3. The Complaint explains the $30,000 payment as follows:

34. On September 24, 1999, after investing substantially all of their liquid assets in Worthington stock, defendants Hughes and Stacy received a check for $30,000 from defendant Roger Blackwell. Defendants Hughes and Stacy used the $30,000 from defendant Roger Blackwell to buy even more Worthington stock in late September 1999.

35. During the Commission's investigation, defendant Hughes falsely characterized the $30,000 payment as deferred compensation and a bonus that she was

owed. In fact, Blackwell & Associates recorded the payment as a loan receivable. Defendants Hughes and Stacy repaid the $30,000 without interest on August 31, 2000. On that same date, defendant Roger Blackwell paid defendant Hughes $30,000. During the Commission's investigation, defendant Hughes mischaracterized the nature of the $30,000 payment by defendant Roger Blackwell in order to mislead the Commission or otherwise misdirect, impede or obstruct the Commission's investigation and to hide evidence of insider trading.

tember 1999, Blackwell used frequent flier miles to provide Jack and his wife with plane tickets to Europe. On September 22 and 23, 1999, Blackwell and Jack stayed at the same hotel in Monaco and dined together. While they were in Monaco, Blackwell allegedly again provided material non-public information to Defendant Jack concerning Kellogg's proposed acquisition of Worthington. On September 27, 1999, Jack purchased an additional 500 shares of Worthington stock. Jack spent a total of $37,386.15 on Worthington stock in September 1999. He sold his 3,000 shares on October 1 and October 12, 1999, deriving a profit of $31,146.35.

Defendant Blackwell and Defendant Jack each own 50% of Defendant Black–Jack. According to the Complaint, Blackwell "routinely received brokerage account statements and trade confirmations for the defendant Black–Jack brokerage accounts." Blackwell also "routinely reported his share of the defendant Black–Jack profits on his tax returns each year." On September 8, 1999, Defendant Jack bought 2,500 shares of Worthington stock on behalf of Defendant Black–Jack. On September 9, 1999, Jack purchased an additional 500 shares of Worthington stock on behalf of Black–Jack. The total cost to Black–Jack of these purchases was $30,187.13. When the shares were sold, on October 1 and October 4, 1999, Black–Jack realized profits of $26,883.87. Blackwell did not disclose these sales or purchases to the SEC.

## B. Procedural History

In a Complaint filed January 21, 2003, the SEC alleges that both the tipper, Roger Blackwell, and the tippees, Dale Blackwell, Christian Blackwell, Hughes, Stacy, the Pension Plan Trust, Jack, and Black–Jack, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5,

based on the conduct described above. Additionally, the SEC alleges violations of Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rules 16a–2, 17 C.F.R. § 240.16a–2, 16a–3, 17 C.F.R. § 240.16a–3, and 16a–8, 17 C.F.R. § 240.16a–8, thereunder by Defendant Roger Blackwell. Count II, for violations of Section 16(a) and the rules promulgated thereunder, is based on Blackwell's alleged failure to file required reports of ownership and changes of ownership based on the purchase and sale of Worthington stock by both the Pension Plan Trust and Black–Jack.

The SEC seeks the following relief: (1) a declaration that Defendants have violated the laws set forth above; (2) an order enjoining Blackwell from violating the above provisions of the Exchange Act and the rules thereunder; (3) an order enjoining all other Defendants from violating the stated securities laws; (4) disgorgement of Defendants' illegal profits plus prejudgment interest; (5) an order requiring Defendants to pay civil penalties; (6) an injunction prohibiting Blackwell from acting as an officer or director of any issuer whose securities are registered pursuant to Section 12 of the Exchange Act; (7) retention of jurisdiction in order to ensure the implementation of all Court orders; and (8) such other and further relief as the Court deems appropriate.

On May 1, 2003, Defendant Blackwell, in his personal capacity, filed a Motion to Dismiss. The Motion to Dismiss is based on failure to state a cause of action under Rule 12(b)(6) of the Federal Rules of Civil Procedure and failure to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Defendants Dale and Christian Blackwell, as well as Defendant Roger Blackwell in his capacity as trustee of the Pension Plan Trust, filed Motions to Dismiss in which

they provided some particularized argument, but then adopted Roger Blackwell's Motion to Dismiss *in toto*. Defendants Jack and Black–Jack merely adopted, without further comment, that portion of Roger Blackwell's Motion that addresses the claims against them.

Defendants Hughes and Stacy initially answered the Complaint. After the SEC filed its opposition to Defendants' Motions to Dismiss, however, Defendants Hughes and Stacy filed a Motion for Judgment on the Pleadings based on failure to state a claim on which relief may be granted and failure to plead fraud with particularity.[4] While Hughes and Stacy give their own cast to the same issues discussed by other Defendants in their Motions to Dismiss, they "join in those portions of Roger Blackwell's motion to dismiss which specifically discuss the shortcomings of the SEC's complaint as it applies to them." Hughes and Stacy emphatically do not join in those portions of Roger Blackwell's Motion to Dismiss that pose certain "what if" scenarios designed to show that Hughes and Stacy's trades could have been the result of some wrongdoing by Hughes rather than a tip received from Blackwell.

### III. STANDARDS OF REVIEW

#### A. Rule 12(b)(6)

In considering a Rule 12(b)(6) motion to dismiss, this Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir.1996). The Court must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Lillard*, 76 F.3d at 724 (quoting *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir.1994)); *see Murphy v. Sofamor Danek Group, Inc. (In re Sofamor Danek Group, Inc.)*, 123 F.3d 394, 400 (6th Cir.1997) ("All factual allegations made by the plaintiff are deemed admitted, and ambiguous allegations must be construed in the plaintiff's favor.") (citations omitted).

While the complaint need not specify every detail of a plaintiff's claim, it must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gazette*, 41 F.3d at 1064. While liberal, this standard of review does require more than the bare assertion of legal conclusions. *In re Sofamor Danek Group*, 123 F.3d at 400; *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). In fact, conclusory statements or legal conclusions need not be considered in deciding a Rule 12(b)(6) motion. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir.1997).

#### B. Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure provides that in a claim of

---

4. Hughes and Stacy take issue with the Commission's claim that, because they answered the Complaint, they "had no trouble determining what the SEC's claim against them was and the grounds upon which it rests." Hughes and Stacy state that because the SEC has "chosen to make their non-participation an issue," they "have no choice but to join the battle."

fraud, including a claim for securities fraud, "[t]he circumstances constituting the fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). To satisfy this requirement, the plaintiff must specifically detail the facts and circumstances that are claimed to constitute fraudulent conduct. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.1999) (quoting *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993) (plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud")); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (pleader must identify "the who, what, when, where, and how: the first paragraph of any newspaper story"). While the circumstances of the fraud must be stated with particularity, the plaintiff need not present facts or evidence in the complaint. *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 680 n. 9 (6th Cir.1988). In addition, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

■ Rule 9(b) is to be read in conjunction with Rule 8(a), which requires that pleadings include "a short and plain statement of a claim showing that the pleader is entitled to relief" and that each averment be "simple, concise, and direct." Fed.R.Civ.P. 8(a) and 8(e); *see Michaels Bldg. Co.,* 848 F.2d at 679. Furthermore, the Sixth Circuit has been willing to relax the requirements of Rule 9(b) where the specific information is only within the opposing party's knowledge. *Michaels Bldg. Co.,* 848 F.2d at 680. "The threshold test is whether the complaint places the defendant on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way

plaintiffs [sic] claim of fraud.'" *Coffey,* 2 F.3d at 162 (quoting *Brewer v. Monsanto Corp.,* 644 F.Supp. 1267, 1273 (M.D.Tenn. 1986)). The plaintiff is required to meet the Rule 9(b) standard as to each defendant against whom fraud is alleged. *See, e.g., Lincoln Nat'l Bank v. Lampe,* 414 F.Supp. 1270, 1278 (N.D.Ill.1976).

### C. Rule 12(c)

■ A motion for judgment on the pleadings may be made "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed.R.Civ.P. 12(c). Where the Rule 12(c) motion is based on the argument that the complaint fails to state a claim upon which relief may be granted, it is judged under the same standard of review as a Rule 12(b)(6) motion. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 11 (6th Cir.1987) ("Where the Rule 12(b)(6) defense is raised by a Rule 12(c) motion for judgment on the pleadings, we must apply the standard for a Rule 12(b)(6) motion in reviewing the district court's decision."). The standard set forth above thus applies. *See Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 512 (6th Cir.2001) (in reviewing 12(c) motion, courts should "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief").

### IV. ANALYSIS

#### A. Roger Blackwell's Motion to Dismiss

##### 1. *Section 10(b) and Rule 10b–5*

The SEC alleges that Blackwell engaged in fraudulent insider trading and tipping in violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereun-

der. Blackwell contends that the SEC has not alleged adequately each of the three elements of a claim for insider trading based on tipping and certainly has not stated those allegations with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. According to Blackwell, the SEC relies solely on boilerplate legal conclusions without providing any actual facts to support those conclusions. The Commission counters that Rule 9(b) does not require the pleading of detailed evidentiary matter and that the Complaint is adequate to apprise Defendants fully of the circumstances of the fraud in order to put them on notice of the Commission's claims.

■ Section 10(b) is a broad antifraud provision that makes it unlawful for any person purchasing or selling securities "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b). Rule 10b–5, which implements Section 10(b), provides, *inter alia*, that no person may "employ any device, scheme, or artifice to defraud ... or ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The securities laws do not require absolute parity of information in the marketplace. *Dirks v. SEC,* 463 U.S. 646, 657, n. 16, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (citing *Chiarella v. United States,* 445 U.S. 222, 233, 235, n. 20, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). A corporate insider, however, such as a member of a company's board of directors, may be liable for violations of Section 10(b) and Rule 10b–5 if he has breached his fiduciary duty to the corporation and its shareholders by making use of material non-public information about the company to attain a personal benefit either by trading in the company's securities himself or by providing tips to allow others to do so. *See Dirks,* 463 U.S. at 654–55, 659, 661–63, 103 S.Ct. 3255.

■■ In order to state a cause of action against Blackwell, the SEC must allege adequately the following elements: (1) that Blackwell breached his fiduciary duty to Worthington's shareholders; (2) that he communicated material non-public information about Worthington to at least one outsider with the intent of giving the outsider an informational advantage in trading in the shares of the company; and (3) that he derived a personal benefit by breaching his duty in this way. *See id.; SEC v. Davis,* 689 F.Supp. 767, 771 (S.D.Ohio 1988). Because the claim is one for fraud, these elements must be pled with the particularity required by Rule 9(b). Fed.R.Civ.P. 9(b); *Hoffman v. Comshare, Inc. (In re Comshare, Inc. Sec. Litig.),* 183 F.3d 542, 548 (6th Cir.1999) (claims under Section 10(b) of Exchange Act and Rule 10b–5 must satisfy requirements of Rule 9(b)).

### a. Breach of Fiduciary Duty

■ Blackwell contends that the only statement in the Complaint offered to establish the breach of duty element of the SEC's claim is the bare legal conclusion, "Roger Blackwell repeatedly breached his duty of trust and confidence to Worthington and its shareholders...."[5] If this legal conclusion (which should not be considered on a motion to dismiss) is set aside, then, Blackwell asserts, it becomes clear that

---

**5.** The entire sentence reads, "Roger Blackwell repeatedly breached his duty of trust and confidence to Worthington and its shareholders by disclosing material non-public information to at least his father, son, employees, friends, and close confidants."

the SEC has not pled facts sufficient to satisfy its burden as to this element.[6] The SEC contends that it is well established that a corporate insider, such as Blackwell, breaches his duty of trust if he discloses material non-public information for personal benefit. Because the SEC has provided adequate allegations as to the disclosures and the personal benefit, Blackwell's breach of fiduciary duty may be inferred.

■■■■ The Commission is correct that the Court may infer breach of duty from allegations that Blackwell disclosed material non-public information for personal gain. As the Supreme Court has noted, "Whether disclosure is a breach of a duty ... depends in large part on the

purpose of the disclosure.... [T]he test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders." *Dirks*, 463 U.S. at 662, 103 S.Ct. 3255; *see Davis*, 689 F.Supp. at 771. In *United States v. O'Hagan*, 521 U.S. 642, 676, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), the Supreme Court further observed that "it is a fair assumption that trading on the basis of material, non-public information will often involve a breach of a duty of confidentiality to the bidder or target company or their representatives."[7] In a recent insider trading case, the court found a violation where the defendant tipper was a corporate insider, his corporation's takeover of

---

6. Blackwell argues that, even if he had discussions regarding the Kellogg/ Worthington transaction, as alleged, with Defendant Hughes, with Blackwell & Associates employee Mary Hiser (who apparently traded in Worthington securities in August and September 1999 but was not charged as a defendant), and with Defendant Jack, the SEC has not, in the Complaint, ruled out the possibility that these discussions did not constitute a breach of his fiduciary duty. For example, Blackwell asserts that if he had informed Hughes and Hiser about the proposed acquisition in the context of their employment duties at Blackwell & Associates, or if they had merely overheard a discussion of that acquisition that occurred over the telephone, then there would be no breach of his duty. Likewise, if he had disclosed the details of the transaction to Defendant Jack for the purpose of seeking legal advice, then the disclosure would not constitute a breach of fiduciary duty.

This argument misapprehends the proper inquiry on a motion to dismiss. Even if the Complaint lends itself to the inferences stated above, the Court need not decide that the language in the Complaint forecloses all alternative inferences. Rather, the Complaint may stand if merely one inference may be drawn from statements in the Complaint that would give the plaintiff a cause of action. *See Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir.1997) (stating that complaint must contain either direct or inferential allegation with respect to each material element of claim).

7. The Court made this statement in the context of the "misappropriation theory" of insider trading. The "traditional" or "classical theory" of insider trading liability, at issue here, provides that Section 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, non-public information. *O'Hagan*, 521 U.S. at 651–52, 117 S.Ct. 2199. Under the classical theory, liability is predicated on the insider's duty to the shareholders of his corporation. *Id.* at 652, 117 S.Ct. 2199 (citing *Chiarella v. United States*, 445 U.S. 222, 228–29, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). The misappropriation theory, on the other hand, provides that a person violates Section 10(b) and Rule 10b–5 when he misappropriates confidential information for securities trading purposes in breach of a duty owed to the source of the information. *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199. For example, in *O'Hagan*, the defendant had breached a duty he owed to his law firm and to its client, the bidder in a proposed tender offer, by trading in the securities of the target company. *Id.* at 653, n. 5, 117 S.Ct. 2199. While the Supreme Court's comment was thus not made in the precise context currently before the Court, it is *a fortiori* applicable in the context of classical insider trading, where the breach of fiduciary duty is generally clearer than in the misappropriation context.

another was material non-public information, and the defendant tippees used this information in their purchases and sales of the target company's stock. *SEC v. Blackman*, No. 3:99–1072, 2000 WL 868770, at *8 (M.D.Tenn. May 26, 2000). Based on these findings, the court concluded that the SEC had alleged sufficient facts to give rise to a "fair assumption" of the tipper's breach of a fiduciary duty. *Id.*

 Here, the SEC has alleged that Blackwell was a director of Worthington. Thus, it is clear that he was a corporate insider and that he had a duty to Worthington's shareholders not to use material non-public information about Worthington for personal benefit.[8] It also is clear for purposes of this Motion, based on the SEC's allegations that Blackwell attended Board meetings at which the matter was discussed, that Blackwell actually possessed material non-public information concerning Worthington's possible merger with Kellogg.[9] The Court will discuss below whether the SEC provided adequate allegations to establish that Blackwell disclosed this material non-public information and that he derived a personal benefit from the disclosure. If the SEC has pled adequately these two elements, then the "fair assumption" is that the SEC has stated a cause of action based on breach of fiduciary duty.

### b. Disclosure of Material Non-Public Information

 Roger Blackwell contends that the SEC's bare legal conclusions that he "disclosed" or "provided material non-public information concerning Kellogg's acquisition of Worthington" to each of the Defendants is insufficient to comply with either Rule 12(b)(6) or Rule 9(b) absent specific facts as to what Blackwell actually said to each Defendant. The SEC, on the other hand, contends that circumstantial evidence is sufficient to prove defendants' covert communications and that Rule 9(b) does not require the pleading of detailed evidentiary matters as long as the defendants are apprised adequately of the claims against them.

Blackwell emphasized at oral argument, and stressed throughout his memoranda, that the SEC acts as though it has direct evidence, yet fails to provide it. Such is not the Commission's burden at this stage of the proceedings. This argument is more appropriately made on summary judgment, where the plaintiff may be required to provide direct or circumstantial evidence to support its legal claims. In its complaint, the plaintiff is not required to plead evidence. *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 n. 9 (6th Cir.1988) (Rule 9(b) "requires only that the 'circumstances' of the fraud be pled with particularity, not the evidence of the case."). It is the tool of summary judgment, not of dismissal, that "filters out cases in which plaintiffs rely entirely upon conclusory assertions and speculative allegations to state a claim for relief." *SEC v. Truong*, 98 F.Supp.2d 1086, 1098 (N.D.Cal. 2000) (quoting *Dominguez v. Eli Lilly & Co.*, 958 F.Supp. 721, 726–27 (D.Puerto Rico 1997)); *see Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir.1973) ("The pleading rules, designed to avoid

---

8. The SEC has furthermore alleged that Worthington had a policy prohibiting insider trading and that Blackwell was aware of this policy.

9. Not only does Blackwell not argue that the information was immaterial, but the SEC has pled adequately that the information was material. After the public announcement that Kellogg would be paying $24 per share for Worthington stock, the price of Worthington stock increased dramatically, giving rise to the clear inference that advance notice of the acquisition would have materially affected many investors' interest in Worthington stock.

and reduce long and technical allegations, are necessarily supplemented by procedures including summary judgment which enable a party to have a judgment in a relatively short time if there is actually no bona fide claim presented."); *cf. Michaels Bldg. Co.*, 848 F.2d at 680–81 (expressing reluctance to dispose of claim on motion to dismiss as long as "there is a reasonable basis upon which to make out a cause of action from the events narrated in the complaint" and "defendants have adequate notice of why they are being sued and are capable of preparing a responsive pleading").

The SEC has pled the "who, what, when, where, and how" of the alleged disclosures as well as could be expected under the circumstances. The Complaint explicitly states to whom the disclosures were made: Dale Blackwell, Christian Blackwell, Kelley Hughes, Kevin Stacy (Stacy actually learned about the Kellogg/Worthington transaction from his wife Hughes, who learned about it from Blackwell), Mary Hiser, and Arnold Jack. While the SEC does not provide the exact content of the disclosures, it does allege the general topic of the disclosures ("Kellogg's acquisition of Worthington"). Other information in the Complaint, regarding what Blackwell knew at various times and what the acquisition would mean to Worthington stockholders, is sufficient to create a reasonable inference of the contents of those disclosures.

The Complaint also provides sufficient information as to the when, where, and how of the disclosures. As to Dale Blackwell, the information was disclosed on September 8, 1999, at Dale Blackwell's home, during a conversation in which Dale Blackwell asked his son, Roger, for investment advice concerning both Worthington and Bank One. As to Christian Blackwell, the information was disclosed in late August 1999, over the telephone, during a conversation in which Christian Blackwell and his father, Roger, discussed investing in Worthington and several other companies on whose boards of directors Blackwell served. As to Kelley Hughes, the information was disclosed on August 31, 1999, presumably at the offices of Blackwell & Associates, during Hughes and Blackwell's conversation to discuss Hughes's year-end performance review. Additional information also allegedly was disclosed to Hughes during other conversations in September 1999. As to Kevin Stacy, the information was disclosed by his wife, Hughes, shortly after her year-end performance review and at various other points during September 1999. As to Mary Hiser, the information was disclosed on August 27, 1999, presumably at the offices of Blackwell & Associates, during Hiser and Blackwell's meeting to discuss Hiser's annual performance review. As to Arnold Jack, the information was disclosed on September 7, 1999, between 1:43 p.m. and 1:50 p.m., via a telephone conversation from Jack, on his cellular phone, to Blackwell, at his Blackwell & Associates office. Further information was disclosed to Jack on September 22 and 23, 1999, in Monaco, when Jack and Blackwell were staying at the same hotel and dining together. Given that the SEC was not a party to any of these conversations, it has adequately described the times and places that they occurred, and the circumstances involved.

While the Commission has provided the general topic of the disclosures, it has not pled the contents of these disclosures with the particularity that is generally required under Rule 9(b). *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir.1999) (stating that plaintiff must allege with particularity the content of the alleged misrepresentation on which he or she relied). This general rule, however, is based on the typical fraud case, where a plaintiff has relied, to his or her detriment, on a fraud-

ulent statement made by the defendant to the plaintiff. *See id.* In such a case, the content of the misrepresentation is clearly within the plaintiff's knowledge, and particular information concerning the circumstances in which the misrepresentation was made must be provided in order to avoid the very real danger that a defendant might be left unaware of the basis for the plaintiff's claims. *See, e.g., Corabi v. CNA Ins. Cos.,* No. C–2–87–674, 1988 WL 363612, at *4 (S.D.Ohio June 21, 1988); *D & G Enters. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago,* 574 F.Supp. 263, 267–68 (N.D.Ill.1983); *see also Lincoln Nat'l Bank v. Lampe,* 414 F.Supp. 1270, 1279 (N.D.Ill.1976) (holding that plaintiff must at least identify time, place, circumstances, and contents of conversations in which particular defendants dealt directly with him).

Here, Defendants have been provided with more than enough information to apprise them of the basis for the SEC's claims; hence, the notice requirement has been met. The fact that the Commission has not provided the exact words used in particular conversations or, for some Defendants, the exact dates that disclosures were made does not preclude Defendants from being aware of which conduct they pursued that the SEC finds objectionable. The disclosures here do not take on the same significance as the representations in the typical fraud case. In such a case, knowing exactly what was said is important because the plaintiff relied on those words. Here, however, the exact terms that Blackwell might have used to inform his family members and friends that Worthington was about to be acquired by Kellogg, which would cause the price of Worthington's stock to rise substantially, are relatively unimportant. The Complaint has alleged, via inference, that Blackwell provided the tippees with enough information about the acquisition to convince them to purchase Worthington stock. Any fur-

ther information about the contents of the conversations is not necessary.

Furthermore, the Sixth Circuit has held that Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendants' knowledge. *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 680–81 (6th Cir.1988) ("We will not demand clairvoyance from pleaders."). To require the SEC to state exactly what was said in each of these private conversations would be to "demand clairvoyance." *Id.* The SEC provides more than enough information to give Defendants notice of the basis for the claims against them. It alleges the general contents of these conversations, the results of these conversations, the parties to these conversations, at least some idea of when these conversations occurred (and for some defendants, very specific occasions), where the conversations occurred, and the general circumstances in which the subject arose.

In *SEC v. Davis,* 689 F.Supp. 767, 773 (S.D.Ohio 1988), the Commission had failed to state specifically the time and location of the alleged transfer of inside information. In addition, the complaint was based on information and belief. *Id.* Nevertheless, this Court denied the defendants' motion to dismiss under Rule 9(b). *Id.* The Court provided several reasons for this holding. First, Rule 9(b), which requires particularity in pleading fraud, must be read in conjunction with Rule 8(a), which requires only a short and plain statement of claims showing that the pleader is entitled to relief. *Id.* Second, Rule 9(b) requires only that "circumstances," not a detailed statement of evidence, be pled. *Id.* Third, an exception to Rule 9(b) exists for matters that are peculiarly within the knowledge of the opposing party. *Id.* Finally, the complaint provided sufficient particularity to afford the defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*

(quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

This case is indistinguishable from *Davis.* In fact, all of the reasoning provided in *Davis* applies with equal, if not greater, force here. The SEC seems to have pled its claims with greater particularity here since it has provided several specifics as to time and location and makes very few statements on information and belief. In fact, it is difficult to escape the conclusion, based on the particular times and places pled, as well as the details regarding the results of the alleged conversations, that defendants adequately were placed on notice of the claims against them.

### c. Personal Benefit

■ Blackwell contends that the SEC has failed to plead adequately a personal benefit because no facts were presented that he obtained any pecuniary benefit as a result of the alleged fraudulent conduct. The SEC contends that it has provided sufficient allegations of a benefit to Blackwell based on him having made a gift of confidential information to family members and close friends.

■ To state a claim for insider trading, the SEC must allege that the tipper has personally benefited, either directly or indirectly, from the disclosure. *Dirks v. SEC,* 463 U.S. 646, 662, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). A direct profit to the insider is not always needed; rather, "the elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Id.* at 664, 103 S.Ct. 3255; *see Davis,* 689 F.Supp. at 771. The requisite personal benefit may thus be established from "an intention to benefit the particular recipient." *Dirks,* 463 U.S. at 664, 103 S.Ct.

3255. A mere allegation that the insider has disclosed material non-public information is sufficient to create a legal inference that the insider intended to provide a gift to the recipient of the information, thereby establishing the personal benefit requirement. *SEC v. Blackman,* No. 3:99–1072, 2000 WL 868770, at \*9 (M.D.Tenn. May 26, 2000) (citing *Dirks,* 463 U.S. at 662–64, 103 S.Ct. 3255); *see also SEC v. Maio,* 51 F.3d 623, 632 (7th Cir.1995) ("The theory is that by disclosing information selectively the insider is, in effect, selling the information to its recipient for things of value to himself.") (citing *Dirks,* 463 U.S. at 664, 103 S.Ct. 3255). A close friendship between the tipper and the tippee also suggests that the tip was intended to benefit the tippee. *SEC v. Warde,* 151 F.3d 42, 49 (2d Cir.1998).

The SEC has alleged sufficiently a personal benefit to Blackwell based on a desire to provide a gift to the tippees and based on indirect pecuniary benefits derived from the trading conducted by the Pension Plan Trust and Black–Jack. As concluded above, the SEC has sufficiently alleged that Blackwell disclosed material non-public information. That allegation alone is enough to allow the Court to find an adequate allegation as to the personal benefit element as well. *Blackman,* 2000 WL 868770, at \*9. The Commission, however, has gone even farther, providing facts to establish close relationships between Blackwell and every tippee sufficient to create an inference that he intended to benefit the tippees with a gift. Blackwell obviously could have intended to give a gift to his family members, Dale and Christian Blackwell. As to Defendant Hughes, the Complaint alleges that she had worked for Blackwell for over ten years, that she was one of Blackwell's close confidants, that Blackwell relied on her to manage the entire Blackwell & Associates office, that Blackwell loaned her $30,000 without seeking any interest or collateral,

and that Blackwell accompanied her and her husband on their search for a new house. To the extent that an intent to benefit Defendant Stacy must be shown, the inference from the Complaint is that any benefit to Hughes also provided a benefit to Stacy. As to Defendant Jack, the Complaint alleges that he and Blackwell have been business associates and friends for over 30 years, that he has represented Blackwell as a lawyer, that they have jointly owned real estate and are partners in Black–Jack, and that Blackwell has provided him with a gift of plane tickets to Europe for himself and his wife.

Blackwell also allegedly provided a tip to Hiser, with whom the SEC does not allege that he had a close relationship. The circumstances surrounding Blackwell's tipping of Hiser, however, are sufficient to create an inference that he intended to provide her with a benefit. The Complaint alleges that, at the same time he disclosed the information about the potential Kellogg/Worthington merger, Blackwell gave Hiser an annual bonus check of $1,000, which he encouraged her to invest. She invested the $1,000 in Worthington stock, presumably based on Blackwell's suggestion. These facts are sufficient to create an inference that Blackwell intended to provide Hiser with a "double benefit" as to her annual bonus by giving her the bonus check then providing her with the information to make a substantial profit on the bonus.

The SEC also contends that Blackwell received a pecuniary benefit in the following three ways: (1) because he owned 50% of Black–Jack, he was entitled to receive 50% of the profits that Black–Jack derived from the illegal trades; (2) because he owns any money in the Pension Plan Trust in excess of what is needed to fund the pension plan, he derived a benefit from

any profits the Pension Plan Trust made from the illegal trades; and (3) because his wife is a direct beneficiary of the Pension Plan Trust, he benefits from the proceeds of the illegal trades made by the Pension Plan Trust. Blackwell clearly stood to benefit from any profits made by Defendant Black–Jack. The Complaint states that he is a 50% owner of the entity. The implication is that he received 50% of Black–Jack's profits and thus derived a personal benefit from Black–Jack's illegal trading. As for the Pension Plan Trust, either it is some sort of fixed benefit plan, which the Complaint implies, in which case Blackwell, through Blackwell & Associates, owns any excess beyond what is required to pay the pension plan benefits, or it is a flexible benefit plan, in which case Blackwell's wife, as beneficiary, stands to benefit from any money earned by the trust. The Complaint thus has alleged sufficiently that Blackwell derived a benefit, albeit indirect, from the illegal trades made by the Pension Plan Trust.

Because the SEC has provided adequate allegations as to both the disclosure of material non-public information element and the personal benefit element, the element of breach of a fiduciary duty has been established. The Court therefore **DENIES** Roger Blackwell's Motion to Dismiss as to Count I of the Complaint.

### 2. *Section 16(a) and Rules 16a–2, 16a–3, and 16a–8*

 Blackwell argues that Count II of the Complaint, relating to alleged violations of Section 16(a) of the Exchange Act and related rules, should be dismissed because the SEC has failed to allege that he had any knowledge of the purchases of Worthington stock made by the Pension Plan Trust and Black–Jack. Without knowledge of these transactions, he could have had no obligation to report them.[10]

---

10. At least for purposes of this Motion, Black- well seems to concede that he was otherwise

The Commission contends that Section 16(a) and the rules promulgated thereunder do not require that a director know of the change in beneficial ownership in order to be obligated to report the transaction.

Section 16(a) of the Exchange Act and Rule 16a–2 thereunder require an officer or director of an issuer of a registered security to file with the Commission a statement indicating any changes in the insider's beneficial ownership of the issuer's equity securities during any month in which there has been a change within ten days after the close of that month. 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a–2. Rule 16a–3 provides that an initial statement by an insider is to be made on Form 3 and subsequent statements of changes in beneficial ownership are to be made on Form 4 or Form 5. 17 C.F.R. § 240.16a–3. For trustees who are subject to Section 16, Rule 16a–8(b)(2) requires trust transactions to be attributed to the trustee and reported by him in his individual capacity when at least one beneficiary of the trust is an immediate family member of the trustee. 17 C.F.R. § 240.16a–8.

 There is very little case law interpreting Section 16(a). There is a paucity of jurisprudence that squarely addresses the issue of whether knowledge of the purchases or sales is required in order to trigger an obligation to report the transactions. In *In re Terex Corp.*, Exchange Act Release No. 34-41312, 1999 WL 228423, at *16 n. 11, 1999 SEC LEXIS 788, at *45 n. 11 (Apr. 20, 1999), the SEC made a finding that no showing of scienter,[11] that is, intent to deceive, defraud, or manipulate, is required for establishing a violation of Section 16(a) of the Exchange Act or Rules 16a–2 and 16a–3 thereunder. The order in that case was entered pursuant to a con-

sent decree rather than following an adjudication, *id.*, 1999 WL 228423, at *1, 1999 SEC LEXIS 788, at *1; however, it still represents an interpretation of the Commission that is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir.1998) (holding that SEC's interpretation that Section 13 and rules thereunder do not require a showing of scienter entitled to deference) (citing *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778); *cf. SEC v. Wills*, 472 F.Supp. 1250, 1268 (D.D.C.1978) ("Section 13(a), like Section 13(d)(1), is a reporting, and not an anti-fraud, provision. . . . Section 13(a) gives no hint that intentional conduct need be found, but rather, appears to place a simple and affirmative duty of reporting on certain persons.") (internal quotations omitted). Furthermore, in *In re Weeks*, Initial Decision Release No. 199, 2002 WL 169185, at *47, 2002 SEC LEXIS 268, at *151 (Feb. 4, 2002), *aff'd, In re Hesterman*, Securities Act Release No. 33-8139, 2002 WL 31374801, 2002 SEC LEXIS 2682 (Oct. 22, 2002), the SEC again held, this time after an adjudication, that scienter is not necessary to establish a violation of Section 16(a). The SEC's interpretation is entitled to deference as long as it provides a permissible interpretation of the statute and rules. *See Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. 2778 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction. . . .").

Blackwell argues that the imposition of strict liability on corporate officers and directors is inconsistent with the intent of

---

required to report these transactions.

**11.** "Scienter" has been defined as "a mental state embracing intent to deceive, manipulate,

or defraud"; in certain instances, recklessness may suffice. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Section 16(a). Blackwell argues that the purpose of Section 16(a) is to preclude corporate insiders from taking advantage of their office—and the access it affords them to corporate information—for their personal benefit. He contends that that purpose is not served by imposing liability where a director does not even know that the transactions are made. The Court disagrees. The purpose of the statute is better served by refusing to allow corporate directors willfully to hide their heads in the sand. Imposing so called "strict liability" for violation of Section 16(a) encourages corporate insiders to take measures to insure that they will know about trades made by others that will inure to the insiders' benefit. Rather than being contrary to the purposes of the statute, the SEC interpretation seems to further Congress's aims far better than the alternative Blackwell suggests.

The question remains whether the SEC interpretation that a showing of scienter is not required to state a violation of Section 16(a) also applies to knowledge. As Blackwell notes, knowledge is a concept that includes inadvertent and/or negligent conduct, while scienter encompasses only intentional conduct. Thus, there could conceivably be no requirement of scienter for a violation of Section 16(a), yet still be a requirement of knowledge.

■■■ An insider may not be held liable generally under Section 16(a) for inadvertent failure to file. *See SEC v. Great Am. Indus., Inc.,* 259 F.Supp. 99, 110 (S.D.N.Y. 1966) (dictum), *rev'd in part on other grounds,* 407 F.2d 453 (2d Cir.1968); *Fuller v. Dilbert,* 244 F.Supp. 196, 215 (S.D.N.Y.1965) (dictum), *aff'd,* 358 F.2d 305 (2d Cir.1966). The issue of an inadvertent failure to file, however, is not really relevant to whether there is a requirement that the filer have knowledge of the transactions at issue. Inadvertent failure to file also does not present the same danger as willful blindness as to whether certain transactions have occurred.

■■■ In light of the policy implications and the SEC's interpretation that a violation of Section 16(a) does not require scienter, this Court sees no reason to engraft a knowledge requirement onto the statute. Even if a knowledge requirement does exist, that requirement has been pled sufficiently here. As to the Pension Plan Trust, the Complaint alleges that upon information and belief, the purchases by the Pension Plan Trust were made by Hughes "with defendant Roger Blackwell's knowledge and/or consent, at his direction or with his subsequent ratification." As to the trades made by Black–Jack, the SEC's allegations that Blackwell routinely received brokerage account statements and trade confirmations is sufficient to create an inference that he actually knew about the purchases of Worthington stock that Defendant Jack effected on behalf of Black–Jack. At the very least, the Complaint raises an inference of negligence, which, in the absence of a scienter requirement, is sufficient to state a claim for violation of Section 16(a). *Cf. Wills,* 472 F.Supp. At 1268 (noting that, because Section 14(a) of Exchange Act has no scienter requirement, negligence alone can support a finding of violation).

Roger Blackwell's Motion to Dismiss is therefore **DENIED** as to Count II of the Complaint.

### B. Other Defendants' Motions

The main argument as to the tippees is that the SEC has not alleged adequately that the tippees knew or had reason to know that Blackwell violated a fiduciary duty by disclosing the material non-public information to them. Most significantly, there are no allegations that any particular defendant knew that Blackwell was a director of Worthington. The SEC contends that the tippees' scienter may be presumed

based on the other circumstances constituting the fraud, including the relationships between Blackwell and the other Defendants, the pattern and timing of the trades, attempts to conceal the trades, and instances of evasion and deception.

A tippee's duty to refrain from trading or to make a disclosure is derivative of the insider's duty. *Dirks v. SEC*, 463 U.S. 646, 659, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). A tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material non-public information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach. *Id.* at 660, 103 S.Ct. 3255. To state a claim for fraudulent insider trading against the tippees, the Commission must therefore make the following allegations: (1) Blackwell possessed material, non-public information regarding Worthington; (2) Blackwell disclosed this information to the tippees; (3) the tippees purchased Worthington stock while in possession of the inside information provided by Blackwell; (4) the tippees knew or should have known that Blackwell violated a relationship of trust by relaying the Worthington information; and (5) Blackwell benefited from the disclosure. *See SEC v. Warde*, 151 F.3d 42, 47 (2d Cir.1998) (citing *Dirks*, 463 U.S. at 646, 654–64, 103 S.Ct. 3255).

The Court already has established, above, that the SEC has pled with the requisite particularity that Blackwell possessed material, non-public information regarding Worthington; that Blackwell disclosed this information to the tippees; and that Blackwell benefited from the disclosure. In addition, the SEC has provided particular allegations to establish, on a *prima facie* basis, that the tippees bought Worthington stock while in possession of the inside information provided by Blackwell. As noted above, the Complaint has established that Blackwell disclosed inside information to the tippees. The Complaint also provides very specific information as to purchases and sales of Worthington stock made by each Defendant, including the dates the purchases were made, the number of shares bought, the price paid for the shares, and the accounts for which the shares were purchased. This information, coupled with allegations as to the timing of the disclosures, is sufficient to create an inference that the tippees were in possession of the inside information at the times that they purchased Worthington stock.

The SEC thus has stated a claim against the tippees if it has met the final element by providing sufficient allegations that each tippee knew or should have known that Blackwell violated a relationship of trust by relaying the Worthington information. This element does *not* need to be pled with particularity. *See* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."). In fact, scienter in a fraud case may be inferred from circumstantial evidence.[12] *See Warde*, 151 F.3d at 48 (fact that tippee and tipper were good friends who often dis-

---

12. The Supreme Court has explained, in the context of proof of scienter, that circumstantial evidence more than suffices:

[T]he proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof [than a preponderance of the evidence]. In any event, we have noted elsewhere that circumstantial evidence can be more than sufficient.

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (citations omitted).

cussed business and investing interests and that tippee habitually discovered who was on the board of directors of a company before investing in it allowed for inference that tippee knew or should have known that tipper was director of company); *SEC v. Euro Sec. Fund,* No. 98 Civ., 7347(DLC), 2000 WL 1376246, at *3 (S.D.N.Y. Sept. 25, 2000) (evidence of evasiveness and inconsistent statements by tippee, as well as connection to insider, supported inference of guilty knowledge); *SEC v. Blackman,* No. 3:99–1072, 2000 WL 868770, at *8 (M.D.Tenn. May 26, 2000) (given tippees' experiences in the market as stockbrokers and their awareness of the timeliness of the information, allegations in the complaint that asserted that they knew or should have known that the disclosure was made in violation of a fiduciary duty were sufficient to survive motion to dismiss); *SEC v. Musella,* 578 F.Supp. 425, 442–43 (S.D.N.Y.1984) (relationship of tipper and tippee, sophistication of tippee, and fact that tippee opened new accounts in which to make illegal trades gave rise to inference that tippee knew or should have known that information was given in violation of tipper's duty of trust).

It is true that the SEC never made an explicit allegation that any Defendant knew or should have known that Blackwell was a director of Worthington who was privy to inside information and had a duty not to reveal that information. However, construing the Complaint liberally and drawing all permissible inferences in favor of the SEC, as the Court is required to do on a motion to dismiss, sufficient inferences can be drawn from what the Commission has pleaded to find that it has stated a cause of action against each tippee. As a general matter, the fact that each Defendant made trades on the basis of the inside information that Blackwell allegedly disclosed suggests that they had reason to trust his information, i.e., because he was a Worthington insider. The

inference also may be drawn from the making of these trades that Defendants were aware that they possessed secret information that gave them an extra advantage. Each Defendant also had a close relationship with Blackwell in which business matters were discussed, suggesting that they had some understanding of his role in Worthington and what that role required. For the reasons detailed below, the Motions to Dismiss of Defendants Dale Blackwell; Christian Blackwell; Roger Blackwell in his capacity as trustee of the Pension Plan Trust; Arnold Jack; and Black–Jack are **DENIED.** The Motion for Judgment on the Pleadings of Defendants Kelley Hughes and Kevin Stacey, likewise, is **DENIED.**

### 1. Dale Blackwell

Based on the close family relationship between Dale and Roger Blackwell and the fact that Dale Blackwell specifically asked his son about Worthington, the SEC has provided sufficient facts to support an inference that Dale Blackwell knew or should have known that Roger Blackwell was a director of Worthington. One inference that may be drawn from Dale Blackwell's specific inquiry about Worthington is that he knew that his son was a director of Worthington and thus would likely be a good source of information about the company. The fact that Dale Blackwell purchased so much more Worthington stock than Bank One stock on the basis of his conversation with his son suggests his awareness that the Worthington information gave him a trading advantage.

### 2. Christian Blackwell

Christian Blackwell also was closely related to Roger Blackwell. In addition, the Complaint alleged that, in the conversation in which the material non-public disclosure was made, the two men

"discussed investing in Worthington and several other companies on whose boards defendant Roger Blackwell served as a director." An inference can be drawn from this statement that Christian and Roger Blackwell were discussing companies for possible investment based on a mutual knowledge that Blackwell was a director of those companies and thus would be able to provide especially helpful investment advice regarding them. The allegation by implication is that Christian Blackwell was aware that his father was a member of Worthington's Board. The fact that Christian Blackwell opened a new account and wrote a bad check in order to effect his purchases of Worthington stock suggests that he was eager to trade on confidential information that he knew would give him an unfair advantage in the marketplace.

### 3. Kelley Hughes and Kevin Stacy

■ Both Hughes and Stacy allegedly had a close relationship with Blackwell; he even accompanied them while they were house hunting. Even more significantly, Hughes worked with Blackwell at Blackwell & Associates for over ten years and presumably had knowledge of many of his business affairs, as well as the obligations that accompanied his various roles. Based on her work, the SEC has created an inference that Hughes was aware that Blackwell was a director of Worthington and had an obligation not to disclose material non-public information about Worthington. The SEC also attempts to establish evasive conduct based on Hughes's explanation for the $30,000 loan. While not terribly persuasive, this allegation does provide some further support for the inference as to Hughes's scienter.

Defendant Stacy's knowledge can be inferred from Defendant Hughes's knowledge since the Complaint alleges that they are married and that they typically make investment decisions jointly. The implication is that Hughes would have explained to Stacy all her reasons for thinking that they should act on Blackwell's tip, including that he was a Worthington insider.

### 4. Roger Blackwell & Associates Pension Plan Trust

■ Roger Blackwell, in his capacity as trustee of the Pension Plan Trust, bases his Motion to Dismiss on the ground that the "barebones allegations" in the Complaint "fail to meet the requirements of the Federal Rules of Civil Procedure." [13] In particular, Defendant Roger Blackwell points out that the Commission merely alleges that, upon information and belief, the purchases by the Pension Plan Trust were made by Hughes "with defendant Roger Blackwell's knowledge and/or consent, at his direction or with his subsequent ratification." As stated above, scienter need not be pled with particularity. Fed.R.Civ.P. 9(b). Assuming that such a knowledge requirement is necessary, the Commission's statement on information and belief is sufficient to satisfy the liberal notice pleading standards of the Federal Rules of Civil Procedure.

### 5. Arnold Jack and Black–Jack Enterprises

■ By stating that Defendant Jack and Roger Blackwell have been friends for over 30 years and are business associates who have jointly owned real estate and are partners in an investment company, the SEC has created an inference that they spoke about business and investment matters and were generally aware of each other's business activities, especially as they might relate to investment matters. Based on the Complaint,

---

**13.** In addition, this Motion to Dismiss adopts the arguments set forth in the Memorandum of Law filed by Roger Blackwell in his personal capacity.

Jack could well have been aware that Roger Blackwell was a director of Worthington. As both a lawyer and a sophisticated investor, he should have been aware that Roger Blackwell owed a duty to the shareholders of Worthington not to disclose any material non-public information. Jack's knowledge may be imputed to Defendant Black–Jack since Jack is managing partner of the entity.

## V. CONCLUSION

Based on the foregoing reasons, the Court **DENIES** Defendants' Motions to Dismiss and **DENIES** Defendants Hughes and Stacy's Motion for Judgment on the Pleadings.

**IT IS SO ORDERED.**