UNITED STATES SECURITIES and
EXCHANGE COMMISSION,
Plaintiff,

v.

David W. MAXWELL,
et al., Defendants.

No. 2:03–CV–64.

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 20, 2004.

Mark Thomas D'Alessandro, Columbus, OH, Gregory P. Von Schaumburg, Asheesh Goel, Peter B. Driscoll, Andrea R. Wood, Kathryn A. Pyszka, christopher S. Shearer, Securities & Exchange Commission Midwest Regional Office, Chicago, IL, for Plaintiff.

Dennis J. Concilla, Stephanie Michelle Rawlings, Carlile Patchen & Murphy—2, Elton L. Jehn, Kegler Brown Hill & Ritter—2, Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

## I.  INTRODUCTION

This enforcement action filed by the United States Securities and Exchange Commission ("SEC" or the "Commission") involves alleged insider trading in the stock of Worthington Foods, Inc. ("Worthington"). The SEC alleges that Defendant, David W. Maxwell, a senior executive at Worthington, provided an illegal tip to his barber, Defendant, Elton L. Jehn, prior to the October 1, 1999, announcement that the Kellogg Company ("Kellogg") had entered into an agreement to acquire Worthington. The SEC contends that this tip allowed Defendant Jehn to profit in violation of the federal securities laws. This matter is currently before the Court on Motions for Summary Judgment filed by Defendants Maxwell and Jehn.

For the following reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment.

## II.  BACKGROUND

### A.  Facts

Prior to November 29, 1999, Worthington was a publicly traded corporation based in Worthington, Ohio, that produced meat alternative food products made from soy and wheat proteins. Worthington's securities were registered under Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"). Its common stock was traded on the NASDAQ National Market, and its options were traded on the Philadelphia Stock Exchange. From August 1 to September 30, 1999, Worthington's stock traded in the $11 15/16 to $14 3/8 range.

Kellogg is a Delaware company headquartered in Michigan with subsidiaries that manufacture and market ready-to-eat cereal and convenience food products. On July 8, 1999, representatives from Kellogg approached Worthington's Chairman, President, and Chief Executive Officer ("CEO"), Dale Twomley, to discuss the possibility of a business combination. On July 16, 1999, top Kellogg officials met with Twomley and other Worthington officials to execute a confidentiality agreement. On July 20, 1999, during a regularly scheduled board meeting, Twomley informed Worthington's Board of Directors (the "Board") of the ongoing discussions with Kellogg. On August 10, 1999, Twomley and Worthington officials discussed pricing the deal at .76 Kellogg share per Worthington share, or $26.08

per Worthington share. On August 11, 1999, the Board authorized the negotiation of a definitive merger agreement under the terms offered by Kellogg. Shortly thereafter, Worthington formally engaged U.S. Bancorp Piper Jaffray Inc. to serve as Worthington's investment banker in connection with the proposed merger.

Over a period of approximately four weeks beginning on August 24, 1999, Kellogg conducted due diligence of Worthington. On August 26, 1999, the Board authorized management to pursue an all cash transaction with Kellogg. Around this time, in late August of 1999, Maxwell, who was then director of materials management for Worthington, was advised of a possible business combination involving Kellogg and Worthington. Kellogg delivered an initial draft of the merger agreement to Worthington on August 30, 1999. During September 1999, Worthington's due diligence teams visited Kellogg at its Battle Creek, Michigan, headquarters and met with outside auditors regarding the potential merger.

On September 23, 1999, Twomley and Kellogg officials agreed to a price of $24 per share for Worthington stock. The next day, on September 24, 1999, the Board authorized management to complete its negotiation of a definitive merger agreement. On September 29, 1999, the Board met and approved the merger agreement. The parties executed the merger agreement on September 30, 1999. On the morning of October 1, 1999, the parties issued a press release announcing the merger agreement, pursuant to which Kellogg would pay $24 for each share of Worthington stock. On that day, Worthington's stock price closed at $23 1/16, up $8.75, or 61.4%, from the previous day's closing.

At all relevant times, Maxwell was employed as Worthington's director of supply chain management. His responsibilities included Worthington's purchasing operations, production planning, inventory control operation, and contract manufacturing. Maxwell was first informed of the merger, on or about August 26, 1999, so that he could assist Kellogg with its due diligence process. Maxwell began providing Kellogg information relating to its due diligence that very afternoon and worked closely with representatives of Kellogg from that point forward.

When Twomley told Maxwell about Worthington's negotiations with Kellogg, he explicitly instructed Maxwell to keep the information confidential. Twomley also told Maxwell not to use the information for personal benefit. In addition, Worthington had an insider trading policy that prohibited employees from trading in Worthington's securities or tipping others while in possession of material, nonpublic information. Maxwell was aware of Worthington's policy against insider trading and understood that he was prohibited from trading Worthington stock while in possession of material, nonpublic information and that he was prohibited from tipping others about that information.

Jehn has been self-employed as a barber for 45 years. At the time of the Worthington merger, he owned a barbershop in Worthington, Ohio, and had clients who were Worthington employees. Jehn goes by the name "Al," and Maxwell only knew him by that name. Jehn enjoyed investing in the stock market and had a practice of asking his clients about the corporations for which they worked. As of August 1999, Jehn had been Maxwell's barber for over 15 years. Twomley, who was also one of Jehn's clients, had been referred to Jehn by Maxwell.

During Maxwell's barber appointments, he and Jehn would discuss family and personal matters, as well as how things were

going at Worthington. Jehn knew that Maxwell worked at Worthington but was not sure of Maxwell's official title or whether Maxwell was an executive with the company. Jehn believed that Maxwell's responsibilities involved purchasing, and Jehn knew that Maxwell knew Twomley. Maxwell often told Jehn whether he was busy at work and whether he was going out of town on business.

Maxwell and Jehn also discussed their securities investments with each other. Maxwell knew that Jehn was active in the stock market. On a couple of occasions, Jehn recommended certain mutual funds to Maxwell. Prior to September 1999, Jehn had asked Maxwell about the possibility of Worthington being sold on several occasions. Maxwell may have on some occasion encouraged Jehn to purchase Worthington stock on the ground that it was a good buy and the company probably would be acquired at some point. Maxwell admitted that Jehn called him on a couple of occasions and even called him once at home to ask him if Worthington was going to be sold. Other than these phone calls and Maxwell's haircut appointments, Maxwell and Jehn did not socialize with each other. They were not close personal friends.

On September 22, 1999, Maxwell visited Jehn's barbershop for a haircut. During the haircut, Maxwell and Jehn discussed Worthington. Maxwell told Jehn that there was a "rumor" that there were one or two buyers interested in Worthington. At this time, Maxwell knew about the negotiations between Worthington and Kellogg, was "confident" that the deal was going to happen, and thought the possibility of Worthington's stock doubling "was pretty

apparent." Maxwell did not indicate to Jehn that the information he provided was confidential. Maxwell did not advise Jehn that he should purchase Worthington stock, and Jehn did not provide Maxwell with any form of consideration for the information.

After talking to Maxwell, Jehn subsequently told a friend, James Adams, that he had heard that Worthington was going to be bought out and that an "inventory" was being conducted in connection with the acquisition.[1] Jehn admitted that he believed that Maxwell might have had non-public information about the acquisition of Worthington; however, Jehn stated that he does not think he asked Maxwell where Maxwell had obtained the information. Jehn did not ask Twomley about the possible merger because he did not believe Twomley would have told him anything.

On September 22, 1999, after speaking with Maxwell about the potential sale of Worthington, Jehn began to purchase Worthington stock. Jehn called his broker to ask how much margin he had available. He used the available margin in his account to purchase Worthington stock. He purchased 1,000 shares of Worthington stock at $12 1/8 per share on September 22 and 500 shares at $12 1/4 per share on September 23 for a total investment of $18,458. Prior to September 22, 1999, Jehn had never purchased Worthington securities. Indeed, Jehn testified that he made these purchases because of his conversation with Maxwell and that, prior to that conversation, he had not planned on investing in Worthington.

Shortly thereafter, Jehn learned that by trading options, he could earn a greater

---

1. Adams testified that he believed that Jehn told him that Jehn had obtained this information from a neighbor. Jehn testified that his neighbor, Fatima Hooshiarnejad, a carton packer at Worthington, told him that there were rumors that Worthington was going to be acquired. Hooshiarnejad, however, testified that she never discussed the possible sale of Worthington with Jehn and knew nothing about any special inventory.

return with less cash outlay. Jehn promptly bought as many Worthington options as he though his margin account would permit. On September 27, 1999, Jehn purchased 115 October call options with a strike price of $12.50 on margin, and on September 29, 1999, he purchased 90 October call options with a strike price of $15, for a total investment of $14,708.50. Jehn used $5,000 in cash from his checking account and took a $5,000 advance from his credit card to help fund these purchases. Jehn had never bought options before purchasing these Worthington call options, and he opened a new account to do so.

On October 1, 1999, the day the Worthington acquisition was announced to the public, Jehn sold all of his shares of Worthington common stock and stock options. Jehn's total realized profits from these sales were $191,954.57.

### B. Procedural History

In a Complaint filed with this Court on January 21, 2003, the SEC alleges that both David Maxwell, as the tipper, and Elton Jehn, as the tippee, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, based on the conduct described above. The Commission seeks a permanent injunction, disgorgement of profits, and civil penalties. This matter is now before the Court on Defendants' Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Both Defendants argue that there can be no securities violation because Defendant Maxwell did not gain a personal advantage by tipping Defendant Jehn. Defendant Jehn argues, in the alternative, that the Commission has provided no evidence to establish that he knew that Maxwell was breaching a fiduciary duty to Worthington by disclosing information about the upcoming merger. The Court heard oral arguments on the Defendants' motions on Octo-

ber 8, 2004, thus making them ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies*, 8 F.3d 335, 340 (6th Cir.1993); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the non-movant must then come forward with "specific facts" showing a genuine factual issue for trial).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (noting that all justifiable inferences must be drawn in favor of the non-moving party). The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient, however; there must be evidence from which the jury reasonably could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986); *see also· Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV. ANALYSIS

Section 10(b) is a broad antifraud provision that makes it unlawful for any person purchasing or selling· securities "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b). Rule 10b–5, which implements Section 10(b), provides, *inter alia,* that no person may "employ any device, scheme, or artifice to defraud ... or ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The securities laws do not require absolute parity of information in· the marketplace. *Dirks v. SEC,* 463 U.S. 646, 657 n. 16, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (citing *Chiarella v. United States,* 445 U.S. 222, 233 n. 16, 235 n. 20, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). A corporate insider, however, may be liable for violations of Section 10(b) and Rule 10b–5 if he has breached his fiduciary duty to the corporation and its shareholders by making use of material, nonpublic information about the company to attain a personal benefit either by trading in the company's securities himself or by providing tips to allow others to do so. *See Dirks,* 463 U.S. at 654–55, 659, 661–63, 103 S.Ct. 3255.

■ In order to prove its insider trading claim against Defendant Maxwell, as a tipper, the SEC must establish the following: (1) that Maxwell breached his fiduciary duty to Worthington's shareholders; (2) that he communicated material, nonpublic information about Worthington to at least one outsider with the intent of giving· the outsider an informational advantage in

trading in the shares of the company; and (3) that he derived a personal benefit by breaching his duty in this way. *SEC v. Blackwell,* 291 F.Supp.2d 673, 687 (S.D.Ohio 2003) (citing *Dirks,* 463 U.S. at 654–55, 659, 661–63, 103 S.Ct. 3255, and *SEC v. Davis,* 689 F.Supp. 767, 771 (S.D.Ohio 1988)).

■ The law is well settled that "[a] tippee's duty to refrain from trading or to make a disclosure is derivative of the insider's duty." *Id.* at 696 (citing *Dirks,* 463 U.S. at 659, 103 S.Ct. 3255). Moreover, "[a] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material, nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.* at 660, 103 S.Ct. 3255. In order to prevail on its insider trading claim against Defendant Jehn, as a tippee, the Commission must establish the following: (1) that Defendant Maxwell possessed material, nonpublic information regarding Worthington; (2) that Defendant Maxwell disclosed this information to Defendant Jehn; (3) that Defendant Jehn purchased Worthington stock while in possession of the inside information provided by Defendant Maxwell; (4) that Defendant Jehn knew or should have known that Defendant Maxwell violated a relationship of trust by relaying the Worthington information; and (5) that Defendant Maxwell benefited from the disclosure. *Blackwell,* 291 F.Supp.2d at 696 (citing *SEC v. Warde,* 151 F.3d 42, 47 (2d Cir.1998)).

· Considering the record in the light most favorable to the Commission, the Commission has established that Maxwell possessed material,· nonpublic information about the Worthington acquisition and that he communicated that information to Jehn. The Commission also has estab-

lished that Jehn purchased Worthington stock while in possession of that material, nonpublic information. Both Maxwell and Jehn contend, however, that the Commission is unable to establish the personal benefit element of the claims against them. Defendant Jehn also asserts that the Commission has insufficient evidence to support a conclusion that Jehn knew or should have known that Maxwell was violating a relationship of trust by relaying the information regarding the Worthington merger.

## A. Personal Benefit

Defendant Maxwell contends that Defendants do not have a close friendship, family relationship, or business association that would allow a jury to infer that Defendant Maxwell's alleged tip was intended to benefit Defendant Jehn. Absent some personal gain to Defendant Maxwell from the disclosure, there was no breach of duty by Defendant Maxwell and, therefore, no derivative breach by Defendant Jehn. Defendant Jehn adds that every case relied upon by the Commission to establish personal benefit is distinguishable from the situation here, where the relationship between the two Defendants was no more than the relationship between a barber and his client. Unlike in the cases the SEC cites, there was no history of personal favors between Defendants, and there was no potential benefit, either direct or indirect, that Defendant Maxwell would *realize* by tipping Defendant Jehn.

The Commission counters that the determination of whether a tipper expected to benefit personally from a particular disclosure generally is a question of fact. Further, the showing necessary to prove an intent to benefit is not extensive. The Commission contends that "[a] mere allegation that the insider has disclosed material[,] non-public information is sufficient to create a legal inference that the insider intended to provide a gift to the recipient

of the information, thereby establishing the personal benefit requirement." *Blackwell*, 291 F.Supp.2d at 692; *see also SEC v. Blackman*, No. 3:99–1072, 2000 WL 868770, at *9 (M.D.Tenn. May 26, 2000) (stating that personal benefit can be inferred from the fact that material, nonpublic information was disclosed absent some legitimate reason for the disclosure) (citing *SEC v. Maio*, 51 F.3d 623, 633 (7th Cir. 1995)). The Commission asserts that there is abundant evidence from which a jury reasonably could determine that Defendant Maxwell intended to provide a gift to his long-time barber and friend, Defendant Jehn. Citing to *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir.2000) and *SEC v. Yun*, 327 F.3d 1263, 1280–81 (11th Cir.2003), the SEC argues that the case law does not limit the circumstances in which a personal benefit may be found to those involving very close friends or relatives.

To establish a claim for insider trading, the SEC must allege that the tipper has personally benefited, either directly or indirectly, from the disclosure. *Dirks*, 463 U.S. at 662, 103 S.Ct. 3255 ("Whether disclosure is a breach of a duty ... depends in large part on the purpose of the disclosure.... [T]he test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders."). A direct profit to the insider is not always needed; rather, "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Id.* at 664, 103 S.Ct. 3255; *see Davis*, 689 F.Supp. at 771; *see also SEC v. Maio*, 51 F.3d 623, 632 (7th Cir.1995) ("The theory is that by disclosing information selectively the insider is, in effect, selling the informa-

tion to its recipient for things of value to himself."). The requisite personal benefit may thus be established from "an intention to benefit the particular recipient." *Dirks*, 463 U.S. at 664, 103 S.Ct. 3255. A close friendship between the tipper and the tippee can be an indication that the tip was intended to benefit the tippee. *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir.1998).

■ There is no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Chiarella v. United States*, 445 U.S. 222, 233, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Rather, as emphasized in *Dirks*, a duty to abstain from trading on the basis of material, nonpublic information arises only where the insider seeks to violate a confidential relationship by using information obtained in the course of that relationship for personal benefit. *Dirks*, 463 U.S. at 662, 103 S.Ct. 3255 (noting that "a purpose of the securities laws was to eliminate 'use of inside information for personal advantage' ") (quoting *In re Cady, Roberts & Co.*, 40 S.E.C. 907, 912 n. 15, 1961 WL 59902 (1961)). Personal benefit has been interpreted broadly to include, for example, "a pecuniary gain or a reputational benefit that will translate into future earnings," as well as an outright gift where there is "an intention to benefit the particular recipient." *Dirks*, 463 U.S. at 663–64, 103 S.Ct. 3255.

■ Based on the evidence before this Court, Defendant Maxwell did not stand to gain from disclosing material, nonpublic information concerning the Worthington merger to Defendant Jehn. There was no agreement to split profits or other pecuniary benefit to Defendant Maxwell from the tip. Furthermore, the Commission has provided no evidence of any *quid pro quo.*

Given the parties' relative stations in life, any reputational benefit to Defendant Maxwell in the eyes of his barber is extremely unlikely to have translated into any meaningful future advantage.[2] *Dirks* requires an intended benefit of at least some consequence. *Id.* While the requisite personal benefit may be shown by the intent to provide a gift to benefit the tippee, there is absolutely no evidence that Defendant Maxwell had any reason or intent to give a gift—especially a gift of this magnitude—to Defendant Jehn. There was no family relationship or close friendship between the two Defendants. Indeed, they did not even socialize outside of Defendant Maxwell's haircut appointments. There was no history of substantial loans or personal favors between Defendants; in short, there was no particular reason for Defendant Maxwell suddenly to decide to bestow upon Defendant Jehn a significant gift. Absent some evidence of actual benefit to Defendant Maxwell from the disclosure, the Commission cannot maintain its claims against either Defendant.

This case is distinguishable from the personal benefit cases upon which the Commission relies. In *Yun*, the alleged tipper and tippee had worked together for several years as real estate agents in the same real estate office, had split commissions on various real estate transactions over the years, and were friendly. The court found that the alleged tipper "expected to benefit from her tip by maintaining a good relationship [with the tippee] between a friend and frequent partner in real estate deals." *Yun*, 327 F.3d at 1280. Here, the SEC has not provided any evidence that Defendant Maxwell expected to benefit by maintaining a good relationship with his barber. Unlike in a situation

---

**2.** As Defendant Jehn argues, "Surely it cannot be claimed that the purpose of the alleged disclosure was so Mr. Maxwell would receive a better haircut, a better appointment slot, a better price?"

where the tippee is a frequent business partner of and in the same industry as the tipper, this Court is unable to discern why having a good relationship with his barber would be of consequence to Defendant Maxwell.

At first blush, *Sargent* seems factually similar to the case sub judice since the tippee was the tipper's dentist. In *Sargent*, however, the ties between tipper and tippee were far more substantial than they were here: the tipper and tippee socialized and had dinner together on occasion; the tipper was actively involved in the local chamber of commerce and, because the tippee had many community ties, the tipper would go to him to obtain contacts, to network with other individuals, and to seek funds on behalf of the chamber of commerce; the tipper had referred over 75 people to the tippee for dental work; the tipper's sister-in-law owed the tippee money; and another of the tipper's relatives was threatening to harm the tippee's business. *Sargent*, 229 F.3d at 77. The court concluded, "[F]rom this evidence, a jury could infer that [the tipper] tipped [the tippee] . . . in an effort to effect a reconciliation with his friend and to maintain a useful networking contact." *Id.*

In *Warde*, the court found an intent to benefit the tippee based on the close friendship between tipper and tippee. *Warde*, 151 F.3d at 48. Similarly, in *Maio*, there was a close relationship between tipper and tippee; the tippee had recommended the tipper for his then-current job as CEO of a public company; the tipper had been asked by a common friend to "look after" the tippee following the friend's death; and the tipper had performed numerous significant favors for the tippee over the years, including providing him with a $250,000 interest-free loan. *Maio*, 51 F.3d at 627. In finding that the disclosure was "an improper gift of inside information to [the tippee], a trading

friend," the court relied on the fact that the tipping was just one of many favors the tipper had performed for the tippee over a period of years by reason of their friendship. *Id.* at 632.

Both *Blackwell* and *Blackman*, upon which the Commission also relies, were decided in the context of motions to dismiss. In *Blackwell*, this Court found that the Commission had adequately alleged indirect pecuniary benefits to the tipper from the tips provided to institutional tippees and an intent to provide gifts to the individual tippees, all of whom had a close familial, friendship, and/or business relationship with the alleged tipper. *Blackwell*, 291 F.Supp.2d at 692–93. In both *Blackwell* and *Blackman*, the courts relied, at least in part, on the notion that "[a] mere allegation that the insider has disclosed material[,] non-public information is sufficient to create a legal inference that the insider intended to provide a gift to the recipient of the information, thereby establishing the personal benefit requirement." *Blackwell*, 291 F.Supp.2d at 692; *see Blackman*, 2000 WL 868770, at *9. The Court is not convinced, however, that this proposition should hold true in the context of a motion for summary judgment, where the issue is not merely whether the Commission has alleged a cause of action, but whether the Commission has facts to support its allegations. *See Blackwell*, 291 F.Supp.2d at 689 ("It is the tool of summary judgment . . . that 'filters out cases in which plaintiffs rely entirely upon conclusory assertions and speculative allegations to state a claim for relief.' ") (quoting *SEC v. Truong*, 98 F.Supp.2d 1086, 1098 (N.D.Cal.2000)).

For the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment on the issue of whether Defendant Maxwell derived a personal

benefit from providing the alleged tip to Defendant Jehn.

### B. Knowledge of Breach of Fiduciary Duty

As this Court set forth above, "[a] tippee's duty to refrain from trading or to make a disclosure is derivative of the insider's duty." *SEC v. Blackwell,* 291 F.Supp.2d 673, 696 (S.D.Ohio 2003) (citing *Dirks v. SEC,* 463 U.S. 646, 659, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)). Because this Court holds that Defendant Maxwell did not derive a personal benefit from the disclosure of material, nonpublic information to Defendant Jehn and, hence, did not breach a duty that he owed to Worthington shareholders, Defendant Jehn cannot be held liable under Section 10(b) and Rule 10b–5 for a derivative breach. Thus, having established that Defendant Jehn is not liable for a derivative breach, it is unnecessary for the Court to address the issue of whether Defendant Jehn knew or should have known that Defendant Maxwell breached a fiduciary duty by disclosing material, nonpublic information regarding the Worthington merger.

### V. CONCLUSION

Based on the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment.

**IT IS SO ORDERED.**